[No. B149098. Second Dist., Div. Three. Apr. 30, 2003.]

CURTIS CLAXTON, Plaintiff and Appellant, v.
ATLANTIC RICHFIELD COMPANY et al., Defendants and Respondents.

**COUNSEL**

Benedon & Serlin, Gerald M. Serlin, Douglas G. Benedon; Nordstrom, Steele, Nicolette, Blythe & Jefferson, Nordstrom, Steele, Nicolette & Jefferson, Russell Nordstrom and Lucia Nordstrom for Plaintiff and Appellant.

Haight, Brown & Bonesteel, Rita Gunasekaran and Sandra Bailey Biren for Defendants and Respondents.

## OPINION

**KLEIN, P. J.**—Curtis Claxton (Claxton), plaintiff and appellant, appeals a judgment of nonsuit in favor of defendants and respondents Atlantic Richfield Company, Prestige Stations, Inc., and Thrifty Oil Company (collectively ARCO).

This is a tort action against the owners and operators of a gas station for failure to take reasonable steps to secure their premises against foreseeable criminal acts of third parties. Although there were previous robberies and assaults at the station, the trial court granted nonsuit on the ground the instant attack was racially motivated, there were no prior hate crimes on the premises, and in the absence of prior such incidents, there was no duty to prevent the type of attack which occurred here.

The grant of nonsuit was clearly erroneous. The test is prior *similar* incidents, not prior *identical* incidents. It is immaterial whether prior violent criminal incidents at the site were motivated by racial animus or were simply garden-variety antisocial behavior. Claxton presented substantial evidence of prior similar incidents and other indicia of a reasonably foreseeable risk of violent criminal assaults at the station. Therefore, the judgment is reversed.

### FACTUAL AND PROCEDURAL BACKGROUND

1. *The incident.*

On August 25, 1998, at 4:00 a.m., while driving to work, Claxton, an African-American man, pulled into an ARCO gas station in Compton. Claxton parked his car by the pumps and walked up to the cashier window to pay for gasoline and cigarettes. The cashier was sitting behind a bulletproof window and all nighttime transactions were conducted through a steel drawer. As the cashier was sliding the cigarettes through the steel drawer, David Rodriguez, an alleged member of CV70, a Hispanic gang, blocked his access and said "[m]other fucking nigger. Get out of the way. I'm going to take these cigarettes." Claxton stated he was only trying to get his cigarettes and Rodriguez responded: "No. I want you mother fucking nigger. I want your money and you."

Rodriguez began chasing Claxton. As Claxton was about to enter his car, Rodriguez charged and hit him with a screwdriver. Claxton fell backward

and Rodriguez told him, "[m]other fucking nigger, I'm going to take your money and your car." Rodriguez threatened to kill Claxton.

Rodriguez again charged at Claxton. While Claxton retreated, he tripped and hit his head against a building. Rodriguez began hitting Claxton with his fist and stabbing him with the screwdriver. Claxton feigned unconsciousness and when Rodriguez approached, Claxton knocked him to the ground and pinned him down until the police arrived. When an African-American officer took Rodriguez into custody, he screamed at the officer, "Fuck you, nigger. . . . I'm going to kill you."[1]

In the attack, Claxton sustained numerous injuries, including 14 to 16 stab wounds from the screwdriver, and a closed head brain injury which affects his intelligence and cognitive intellectual function. He suffers from posttraumatic stress disorder, has severe headaches and pain on his right side, lost dexterity in both hands, and developed hearing difficulties. His condition is not expected to improve.

### 2. *Pleadings.*

The operative first amended complaint alleged, inter alia, ARCO negligently operated the gas station and "consciously took no efforts . . . to protect and warn their customers that the said station was a hotbed of criminal activity in which customers were being assaulted, robbed and car jacked by a local Latino gang that was known as CV70. . . . Because of the racist nature of the CV70 gang members and their open hostility towards all African Americans, [ARCO] knew or should have known that CV70 gang members posed a real and substantial threat to any African American who stopped at the station and attempted to conduct any purchases."

Claxton alleged ARCO was liable for failing to provide security patrols at the station, even after repeated requests by Oscar Yancor, the station manager. Claxton further pled ARCO failed to install floodlights to fully illuminate the entire station area, failed to install a battery of security cameras which would have deterred and recorded all criminal activity at the station, and failed to warn its customers, specifically, African-Americans, of the real and present hate crime activity at the station.

### 3. *Trial.*

#### a. *ARCO's initial motion for nonsuit.*

At the conclusion of plaintiff's counsel's opening statement, the defense moved for nonsuit, arguing that plaintiff's opening statement lacked any

---

[1]Because of the racial nature of the attack on Claxton, Rodriguez was prosecuted by the Hate Crimes Division of the Los Angeles District Attorney's Office.

reference to a prior similar incident. The defense stated: "[I]n plaintiff's opening statement he persistently referred to the fact that the defendant should have had security guards there, and I think the law of the State of California is painfully clear that if you are going to make the allegation the landowner should have security guards, there has to be evidence of prior similar incidents."

The trial court denied the motion for nonsuit, stating it was premature, and trial proceeded.

### b. *Evidence of prior criminal activity at the station.*

The record reflects that before the attack on Claxton, the ARCO station had significant gang-related crime problems.

A few months before the August 1998 attack on Claxton, the same perpetrator, Rodriguez, robbed the station manager, Oscar Yancor. The robbery of Yancor occurred at 5:00 a.m., as contrasted with the 4:00 a.m. attack on Claxton. Rodriguez held a knife to Yancor's neck and threatened to kill him unless Yancor gave him the money in his pockets. Yancor reported the incident to ARCO's crime hot line and to Brock Parry, his supervisor.[2]

In March 1998, a customer was robbed at a gas pump, but was not physically harmed. This incident likewise was reported to ARCO's crime hot line.

Gang members repeatedly assaulted customers at the station and forcibly had the customers surrender their change. Individuals would also approach customers, intimidating them and demanding to wash their windows for a fee. About 20 or 25 times a day, Yancor and other employees would have to run off people who were confronting their customers.

Gang members or others frequently entered the station's convenience store and walked out without paying for merchandise, saying things like "I don't want to pay nothing. This area belong[s] . . . to us." They also threatened reprisals if their thefts were reported to the police.

On one occasion, in an altercation between a Hispanic gang and an African-American gang, gang members of one race were chasing gang members of another race in the daytime at the station.

---

[2]On at least four or five occasions, Yancor asked Parry to provide him with security personnel for the station because of all the "bad things" that were happening at the location, such as gang members stealing merchandise and assaulting customers. Yancor feared that something really serious might happen, such as someone being killed. No security guards were ever provided.

The station was also the site of recurring gang graffiti, which was applied even in broad daylight.

Officer Velasco, who had patrolled the area, testified that between 1995 and 1998, Lueders Park, which was adjacent to the ARCO station, was the site of gang loitering, assaults, robberies, and at least five homicides.

Chris McGoey, a professional security consultant, testified as an expert for Claxton. In preparing for the case, McGoey reviewed, inter alia, the depositions of Claxton, assailant Rodriguez, Yancor, Officer Velasco, and cashier Duarte. McGoey opined the station was a high-risk environment because "the graffiti on the building spoke of hate, of one race threatening violence and death against another race on an ongoing basis. There were prior crimes, prior robberies on the property. Mr. Yancor was robbed several times on the property, one time at knifepoint to the throat. There were other times where gang members would come in and shoplift at will and threaten the clerks essentially saying, 'If you report me or try and stop me, you, know, you are going to be hurt,' which is a robbery. [¶] In the file there's information about other crimes, a shooting or a murder at the telephone, a gang member killed on the property previously."

 c. *The second motion for nonsuit.*

After Claxton rested, ARCO renewed its motion for nonsuit, contending the attack on Claxton was unforeseeable because there were no prior similar incidents and therefore ARCO had no duty to provide additional security measures or to cease 24-hour operations. ARCO argued "There was no prior 'similar' incident of a customer of the station being confronted, assaulted and attacked by a gang member due to race. Consequently, the trial court should as a matter of law find in favor of the defendants."

 d. *Trial court's ruling.*

After hearing arguments of counsel, the trial court granted ARCO's motion for nonsuit, setting forth its rationale as follows: "I will acknowledge that one of the things that's really troubling to me, but I think somewhat distinguishable, is the daylight robbery of Mr. Yancor[3] at knifepoint by the very same person who attacked Mr. Claxton, and that's a real problem. I don't see how you can just totally ignore it, except . . . it's in broad daylight and it's an attempt to get money, as the witnesses testified, that he was in the store and the person came upon him and tried to get his money and indeed he

---

[3]The robbery of Yancor occurred at 5:00 a.m., as contrasted with the 4:00 a.m. attack on Claxton. We find the one-hour time difference amounts to a distinction without a difference.

gave him money. [¶] But that was not, in my listening of the testimony, anything that resembled the racial rage that Mr. Rodriguez demonstrated as he attacked Mr. Claxton and demonstrated the racial overtones, the language, the fact that he continued to attack the victim after the arrival of the police. They had to literally pull him off of his victim. His language as well as the ferocity demonstrates this wasn't an ordinary robbery or even an ordinary assault. *This was clearly a racially motivated assault, and I don't know how you get around that.* [¶] . . . [¶] I have to believe that this really is a case where the appellate courts are going to have to say that there is enough similarity. I do not believe that based on what I have heard that the racial . . . assault was predictable, is similar, and, therefore, I have to exercise my judgment and determine that the non-suit is appropriate." (Italics added.)

Claxton filed a timely notice of appeal from the judgment.

## CONTENTIONS

Claxton contends the trial court erred in finding that because there were no previous *racially motivated* assaults at the station, the attack on Claxton was unforeseeable and therefore ARCO did not owe Claxton a duty.

## DISCUSSION

### 1. *Standard of appellate review.*

■ Because a successful nonsuit motion precludes submission of plaintiff's case to the jury, courts grant motions for nonsuit only under very limited circumstances. (*Campbell v. General Motors Corp.* (1982) 32 Cal.3d 112, 117 [184 Cal.Rptr. 891, 649 P.2d 224, 35 A.L.R.4th 1036].) A court may not grant a motion for nonsuit if the evidence presented by the plaintiff would support a jury verdict in the plaintiff's favor. (*Carson v. Facilities Development Co.* (1984) 36 Cal.3d 830, 838 [206 Cal.Rptr. 136, 686 P.2d 656] (*Carson*); *DiPalma v. Seldman* (1994) 27 Cal.App.4th 1499, 1505-1506 [33 Cal.Rptr.2d 219] (*DiPalma*).)

" 'In determining whether plaintiff's evidence is sufficient, the court may not weigh the evidence or consider the credibility of witnesses. Instead, the evidence most favorable to plaintiff must be accepted as true and conflicting evidence must be disregarded. The court must give "to the plaintiff['s] evidence all the value to which it is legally entitled, . . . indulging every legitimate inference which may be drawn from the evidence in plaintiff['s] favor . . ." ' [Citations.]" (*Carson, supra*, 36 Cal.3d at pp. 838-839; accord *DiPalma, supra*, 27 Cal.App.4th at p. 1506.)

█ On appeal from a judgment of nonsuit, "the reviewing court is guided by the same rule requiring evaluation of the evidence in the light most favorable to the plaintiff. 'The judgment of the trial court cannot be sustained unless interpreting the evidence most favorably to plaintiff's case and most strongly against the defendant and resolving all presumptions, inferences and doubts in favor of the plaintiff a judgment for the defendant is required as a matter of law.' [Citations.]" (*Carson, supra*, 36 Cal.3d at p. 839; accord, *DiPalma, supra*, 27 Cal.App.4th at p. 1506.)

Although "a judgment of nonsuit must not be reversed if plaintiff's proof raises nothing more than speculation, suspicion, or conjecture, reversal is warranted if there is 'some substance to plaintiff's evidence upon which reasonable minds could differ . . . .' [Citations.] *Only the grounds specified by the moving party in support of its motion should be considered by the appellate court in reviewing a judgment of nonsuit.* [Citations.]" (*Carson, supra*, 36 Cal.3d at p. 839; accord, *DiPalma, supra*, 27 Cal.App.4th at p. 1506, italics added.)

### 2. *Negligence principles.*

█ An action in negligence requires a showing that the defendant owed the plaintiff a legal duty, that the defendant breached the duty, and that the breach was a proximate or legal cause of injuries suffered by the plaintiff. (*Ann M. v. Pacific Plaza Shopping Center* (1993) 6 Cal.4th 666, 673 [25 Cal.Rptr.2d 137, 863 P.2d 207] (*Ann. M.*).)

The existence of a duty is a question of law for the court. (*Ann M., supra*, 6 Cal.4th at p. 674.) It is the basic policy of this state, as set forth by the Legislature in Civil Code section 1714, that everyone is responsible for an injury caused to another by a want of ordinary care or skill in the management of one's property. (*Rowland v. Christian* (1968) 69 Cal.2d 108, 118-119 [70 Cal.Rptr. 97, 443 P.2d 561, 32 A.L.R.3d 496].) "Every one is responsible, not only for the result of his or her willful acts, but also for an injury occasioned to another by his or her want of ordinary care or skill in the management of his or her property or person, except so far as the latter has, willfully or by want of ordinary care, brought the injury upon himself or herself." (Civ. Code, § 1714, subd. (a).)

The determination of duty in a given situation "involves the balancing of a number of considerations; the major ones are the foreseeability of harm to the plaintiff, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of

preventing future harm, the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost, and prevalence of insurance for the risk involved." (*Rowland v. Christian, supra*, 69 Cal.2d at pp. 112-113.)

■ With respect to the question of the scope of a landowner's duty to provide protection from foreseeable third party crime, "the scope of the duty is determined in part by balancing the foreseeability of the harm against the burden of the duty to be imposed. [Citation.] ' "[I]n cases where the burden of preventing future harm is great, a high degree of foreseeability may be required. [Citation.] On the other hand, in cases where there are strong policy reasons for preventing the harm, or the harm can be prevented by simple means, a lesser degree of foreseeability may be required." [Citation.]' [Citation.] . . . [D]uty in such circumstances is determined by a balancing of 'foreseeability' of the criminal acts against the 'burdensomeness, vagueness, and efficacy' of the proposed security measures. [Citation.]" (*Ann M., supra*, 6 Cal.4th at pp. 678-679.)

A high degree of foreseeability is required in order to find that the scope of a landowner's duty of care includes the hiring of security guards, and the requisite degree of foreseeability rarely, if ever, can be proven in the absence of prior similar incidents of violent crime on the landowner's premises. (*Ann M., supra*, 6 Cal.4th at p. 679.)

In *Ann. M.*, the plaintiff, an employee of a store located in a shopping center, was raped at her place of employment by an unknown assailant. (*Ann. M., supra*, 6 Cal.4th at pp. 670-671.) The issue presented was whether the scope of the landowner's duty to maintain the common areas in a reasonably safe condition included providing security guards in those areas. (*Id.* at p. 670.) The Supreme Court "conclude[d] that violent criminal assaults were not sufficiently foreseeable to impose a duty upon Pacific Plaza [(the landowner)] to provide security guards in the common areas. [Citation.] First, Pacific Plaza did not have notice of prior similar incidents occurring on the premises. Ann M. allege[d] that previous assaults and robberies had occurred in the shopping center, but she offer[ed] no evidence that Pacific Plaza had notice of these incidents. While a landowner's duty includes the duty to exercise reasonable care to discover that criminal acts are being or are likely to be committed on its land [citation], Pacific Plaza presented uncontroverted evidence that it had implemented 'a standard practice . . . to note or record instances of violent crime' and that Pacific Plaza's records contain[ed] no reference to violent criminal acts prior to Ann M.'s rape. Moreover, even assuming that Pacific Plaza had notice of these

incidents, Ann M. concede[d] that they were not similar in nature to the violent assault that she suffered. Similarly, none of the remaining evidence presented by Ann M. [was] sufficiently compelling to establish the high degree of foreseeability necessary to impose upon Pacific Plaza a duty to provide security guards in the common areas. Neither the evidence regarding the presence of transients nor the evidence of the statistical crime rate of the surrounding area [was] of a type sufficient to satisfy this burden." (*Id.* at pp. 679-680.)

Likewise, in *Sharon P. v. Arman, Ltd.* (1999) 21 Cal.4th 1181 [91 Cal.Rptr.2d 35, 989 P.2d 121] (*Sharon P.*), disapproved on another ground by *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 853, fn. 19 [107 Cal.Rptr.2d 841, 24 P.3d 493], the occurrence of a violent third party sexual assault in a commercial underground parking garage was held not sufficiently foreseeable to require the landowner to hire security guards to patrol the garage. (*Sharon P., supra,* 21 Cal.4th at pp. 1185, 1195.) Although a bank, located on the ground floor of the office building above the garage, had been robbed seven times in the two years prior to the incident, no assaults had occurred in the underground garage during the 10 years preceding the attack upon the plaintiff. (*Id.* at pp. 1185-1186.) Thus, the "defendants' duty of care did not include the hiring of security guards for the garage because the bank robberies were not sufficiently similar to the sexual assault crime to establish a high degree of foreseeability." (*Id.* at p. 1195.)

With respect to the duty of a landowner to employ lesser security measures short of hiring security guards, *Sharon P.* is also instructive. There, the plaintiff "argue[d] that, even if defendants were not required to hire security guards because a high degree of foreseeability cannot be established, the occurrence of violent third party crime in underground garages is sufficiently foreseeable that defendants were required to provide protection by simple and less burdensome means. According to plaintiff, defendants were under a 'minimal obligation' to keep the tenant garage brightly lit and clean, to hook up a previously installed security camera located over the elevator of the garage, and to require existing personnel to periodically walk through the garage." (*Sharon P., supra,* 21 Cal.4th at pp. 1195-1196.)

The Supreme Court rejected the plaintiff's argument, explaining: "It is difficult to quarrel with the abstract proposition that the provision of improved lighting and maintenance, operational surveillance cameras and periodic walk-throughs of the tenant garage owned and operated by defendants might have diminished the risk of criminal attacks occurring in the garage. *But absent any prior similar incidents or other indications of a reasonably foreseeable risk of violent criminal assaults in that location,* we cannot

conclude defendants were required to secure the area against such crime." (*Sharon P., supra*, 21 Cal.4th at p. 1199, italics added.)

Guided by these principles, we turn to the evidence in the instant case.

3. *Grant of nonsuit was error because Claxton presented substantial evidence of a reasonably foreseeable risk of violent criminal assaults at the station.*

 As set forth above, Claxton presented substantial evidence showing that prior to Rodriguez's vicious attack on Claxton, the ARCO station had significant crime problems, and that ARCO had notice thereof.

Several months before Rodriguez attacked Claxton, Rodriguez robbed Yancor at knifepoint in an early morning robbery. Yancor reported the incident to ARCO's crime hot line and to Parry, his supervisor.

In March 1998, a customer was robbed at a gas pump, and this incident likewise was reported to ARCO's crime hot line.

Further, gang members repeatedly assaulted customers at the station and forcibly had the customers surrender their change. Individuals would also approach customers, intimidating them and demanding to wash their windows for a fee. Gang members or others frequently stole merchandise from the store and threatened reprisals if their thefts were reported to the police.

There was an altercation between a Hispanic gang and an African-American gang, in which gang members of one race were chasing gang members of another race in the daytime at the station.

The station was also the site of recurring gang graffiti threatening racial violence, which was applied even in broad daylight.

Further, Officer Velasco, who had patrolled the area, testified that between 1995 and 1998, Lueders Park, which was adjacent to the ARCO station, was the site of gang loitering, assaults, robberies, and at least five homicides.

McGoey also testified of "prior crimes, prior robberies on the property. Mr. Yancor was robbed several times on the property, one time at knifepoint to the throat. There were other times where gang members would come in and shoplift at will and threaten the clerks essentially saying, 'If you report me or try and stop me, you, know, you are going to be hurt,' which is a

robbery. [¶] In the file there's information about other crimes, a shooting or a murder at the telephone, a gang member killed on the property previously."

In view of all the above, Claxton presented substantial evidence of prior similar incidents or other indications of a reasonably foreseeable risk of violent criminal assaults at the station, so as to put ARCO on notice and impose on ARCO a duty to provide additional security measures or to cease 24-hour operations.

The trial court's ruling that in the absence of any previous racially-motivated robberies or assaults, there were no prior similar incidents is without legal support. As set forth in *Ann M.* and *Sharon P.*, the test is prior "similar" incidents (*Ann M., supra*, 6 Cal.4th at p. 679; *Sharon P., supra*, 21 Cal.4th at p. 1199), not prior *identical* incidents. Therefore, it is immaterial whether any prior robberies or assaults at the station were motivated by racial animus, or were merely garden-variety antisocial behavior. Claxton presented substantial evidence of prior robberies and assaults, as well as other indications of a reasonably foreseeable risk of violent criminal assaults at the station. Therefore, the nonsuit motion should have been summarily denied.

### DISPOSITION

The judgment is reversed. Claxton shall recover costs on appeal.

Croskey, J., and Kitching, J., concurred.

A petition for a rehearing was denied May 20, 2003, and respondents' petition for review by the Supreme Court was denied July 30, 2003. George, C. J., Baxter, J., and Brown, J., did not participate therein.