[No. B197706. Second Dist., Div. Three. Jan. 29, 2009.]

YU FANG TAN et al., Plaintiffs and Appellants, v.
ARNEL MANAGEMENT COMPANY et al., Defendants and Respondents.

**[CERTIFIED FOR PARTIAL PUBLICATION[*]]**

---

[*]Pursuant to California Rules of Court, rules 8.1100 and 8.1110, this opinion is certified for publication with the exception of part II.

1088

**COUNSEL**

Arkin & Glovsky, Sharon J. Arkin, Scott C. Glovsky; Law Offices of Michael L. Oran and Michael L. Oran for Plaintiffs and Appellants.

Kevin S. Taylor, Daniel S. Wittenberg and Ryan C. Carson for Defendants and Respondents.

**OPINION**

**ALDRICH, J.—**

## INTRODUCTION

Plaintiff Yu Fang Tan was shot in an attempted carjacking in the ungated portion of the common area of his apartment complex. He, along with his wife Chun Kuei Chang and son (together, plaintiffs), sued the management company and property owners, defendants Arnel Management Company, Pheasant Ridge Investment Company, and Colima Real Estate Company, for failure to take steps to properly secure their premises against foreseeable criminal acts of third parties. After an Evidence Code section 402 hearing held in limine, the trial court ruled that three prior violent crimes against others on the premises' common areas were not sufficiently similar crimes to the one perpetrated on Tan to impose a duty on defendants to protect tenants of the apartment complex. The court entered judgment for defendants, and plaintiffs appeal.

In the published portion of this opinion, we hold that plaintiffs' evidence of three prior violent attacks by strangers in the common areas of the apartment complex were sufficiently similar to the attack on Tan to provide substantial evidence of the necessary degree of foreseeability to give rise to a duty on defendants to provide the relatively minimal security measures that plaintiffs seek. Accordingly, we reverse the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

Defendant Arnel Management Company manages the Pheasant Ridge Apartments. Pheasant Ridge is a 620-unit, multibuilding apartment complex,

with over 1,000 residents, situated on 20.59 acres in Rowland Heights, California. Entrance to the complex is gained from Colima Road. The entrance road bisects the property. The beginning of the entrance road has a grassy median and is bordered on both sides by tennis courts. A little farther up the road lie two open parking lots. One is a visitor lot, located on one side of the entrance road, and the other is the parking lot for the leasing office, located on the other side of the road. Just before the two parking lots, in the middle of the entrance road, sits a "guard shack." Continuing past the two parking lots to the back of the property, the entrance road fans out into a circle by which vehicles can turn left or right through two security gates. The apartments are located beyond the security gates. The gates are remote control operated. Most of the property's parking spaces lie behind these gates by the apartments.

Plaintiffs moved into Pheasant Ridge in July 2002 and received one assigned parking space. Tenants could pay an additional fee for a garage, but plaintiffs chose not to rent one. At the time they leased the apartment, plaintiffs learned that if they had a second car, they could park it in unassigned parking spaces located throughout the complex, or in one of the two lots for visitors and the leasing office, as long as the car was removed from the leasing office lot before 7:00 a.m.

At around 11:30 p.m. on December 28, 2002, Tan arrived home. He drove around the property looking for an open parking space because his wife had parked the family's other car in their assigned space. Unable to locate an available space, Tan parked in the leasing office parking lot outside the gated area.

As Tan was parking his car, an unidentified man approached him and asked for help. When Tan opened his window, the man pointed a gun at Tan and told him to get out of the car because the man wanted it. Tan responded, "Okay. Let me park my car first." But the car rolled a little, at which point the assailant shot Tan in the neck. The incident rendered Tan a quadriplegic.

In their ensuing complaint against defendants, plaintiffs alleged three causes of action: negligence, loss of consortium, and fraud. The trial court granted summary adjudication of the fraud cause of action, but denied summary adjudication of plaintiffs' negligence and loss of consortium causes of actions.

Before trial, the court granted defendants' motion for an Evidence Code section 402 hearing to ascertain plaintiffs' evidence of prior similar criminal activity. Defendants wanted to investigate whether the prior incidents raised by plaintiffs were sufficiently similar to make the assault on Tan foreseeable

and hence to impose a duty of care on defendants under *Ann M. v. Pacific Plaza Shopping Center* (1993) 6 Cal.4th 666 [25 Cal.Rptr.2d 137, 863 P.2d 207] (*Ann M.*).

At the hearing, plaintiffs' expert, UCLA (University of California at Los Angeles) sociology professor Jack Katz, looked at police reports, complaints to the police, property management reports, and records of Pheasant Ridge's security service, PACWEST Security Services.[1] After excluding from his analysis those prior incidents involving attacks by acquaintances, Professor Katz found 10 incidents he viewed as being "particularly significant warning signs," of which three involved "prior violent incidents." All of the incidents involved a sudden attack without warning, late at night, by a stranger on someone who was on the ungated portion of the premises.

The first example of a violent incident occurred just under two years before Tan's attack and involved an assault with a deadly weapon. A guard, who was patrolling on his bicycle around 1:30 a.m., saw someone standing by the maintenance garage. The guard approached the subject and asked him what he was doing. The subject replied he was waiting for a friend. When the guard asked for identification, the subject retrieved an unknown object from his pocket and swung it at the guard. The guard raised his arm in self-protection and received a one and one-half inch slash on his forearm.

The second example occurred about a year before plaintiff's attack and before the existing gates at the back of the entrance road were installed. The assailants carjacked a car in Santa Monica with what the victim perceived to be a gun. Finding Pheasant Ridge "a good place to rob somebody" because there was no gate to impede their escape, as they told police later, the assailants came onto the property and robbed a tenant at his parking spot. The assailants committed the robbery by blocking the tenant's car, smashing him on the head, and demanding his valuables. They took the tenant's cell phone and other property.

The third violent incident occurred at 3:55 a.m., nine months before the attack on plaintiff. The incident was "also a violent attack, apparently, by strangers in late nighttime in a parking lot," and may have actually been in the leasing office lot. The assailant suddenly and viciously attacked the tenant in the face causing profuse bleeding. Although the victim did not mention a weapon, the police classified the attack under Penal Code section 245, an assault with a deadly weapon or force likely to produce great bodily injury.

---

[1] PACWEST Security Services was hired by defendant Arnel Management Company to perform nightly patrols throughout Pheasant Ridge. Defendants cross-complained against PACWEST Security Services, which was dismissed earlier in the action after the court granted summary judgment in their favor.

Professor Katz explained that these three prior incidents all involved "strangers coming in late night, suddenly becoming violent against people they don't know in ungated parking areas." Professor Katz opined that these three incidents "show that the probability is foreseeable here that people on this property will be attacked at some point by a stranger in open parking areas late at night."

Plaintiffs also presented nearly 80 examples of thefts from garages or cars or thefts of cars occurring on the Pheasant Ridge property. The trial court excluded the evidence of these thefts because they did not involve robberies or violent attacks on people.

The trial court asked plaintiffs to "articulate your theory of what additional security measures the defendants were under a duty to have in place in order to prevent the harm" to Tan. Accordingly, plaintiffs' counsel stated that the first thing plaintiffs wanted was for defendants to install gates on the entrance roadway before the leasing office and visitor parking lots, rather than at the back of the entrance road. The gates plaintiffs contemplated were "more substantial" than swing-arms; something more akin to the gates defendants had already installed. Counsel explained, "anything that could effectively deter escape is going to help reduce . . . the probability of a carjacking occurring." In particular, *counsel declared that plaintiffs were not asking that defendant undertake a measure that would require ongoing surveillance or monitoring, or necessitate the expenditure of significant funds.*

Professor Katz cited research showing that when gates were installed in crime areas, the rate of violent crime went down. The research showed that "offenders who violently attack strangers are in the first instance concerned with their escapes. And, when you put gates in, you—while they can circumvent the gate to get in, they could climb a fence or get around it, they can't anticipate an easy escape. . . . [T]hey will shy from a crime target that has a gate in favor of one that's ungated. It will shift their focus of attention." Also, gates deter strangers who must explain their presence on the property.

Professor Katz testified that Pheasant Ridge should have ensured that the two objectives (of giving the impression that (1) escape would be impeded and that (2) one's presence on the property would have to be explained) were achieved by having a gate. Professor Katz explained that the effect of gates before the visitor and leasing parking lots would be to block access to all parking spaces and to make escape problematic. He did not eschew a swing-arm that rises and falls as cars enter because criminals could "anticipate on escape that [they] might have to break it and call attention." But, Professor Katz testified, the preferable gate would be "something that is continuous barrier such that if you are on the other side of it, you either have

a reason to be there or you don't." Professor Katz also discussed fencing, either four or six feet, depending on the sight lines of the property. However, he explained, because the vast majority of the property is already surrounded by fencing, only a "very small area" of the property would require an extension of the existing barrier, with the result that the extension would be "very minor." *Professor Katz specifically stated he was not recommending that defendants hire security guards or monitor the property.*

At the close of the hearing, the trial court ruled that plaintiffs "failed to demonstrate that enclosing the entire complex, moving the gates, and installing some system or a guard that would let invited guests enter the complex at night, as they propose, would be any less burdensome than providing full-time security guards at night." Therefore, the court observed, in order to impose a duty on defendants, plaintiffs would have to "demonstrate a high degree of foreseeability of the crime committed against [plaintiffs] based upon prior similar incidents of violent crime at Pheasant Ridge."

The three incidents that Professor Katz characterized as "prior violent incidents," the court ruled, "neither singularly nor collectively, make the armed attempted carjacking and attempted murder of Mr. Tan by gunfire foreseeable." The court stated, "Notably, plaintiffs presented no evidence of a prior attempted carjacking, or an attempted murder, or a completed carjacking or murder, or of anyone being shot, or shot at, or reports of gunfire, at Pheasant Ridge." Therefore, the court held, defendants had no duty to take plaintiffs' proposed additional measures to enhance the security in their common areas, including the leasing office parking lot where the crime occurred. The court granted defendants' ensuing motion for judgment on the pleadings and plaintiffs' timely appeal followed.

## I.

## DISCUSSION

a. *Standard of review of a ruling on a motion for nonsuit.*

"Although duty is a legal question, the factual background against which we decide it is a function of a particular case's procedural posture." (*Castaneda v. Olsher* (2007) 41 Cal.4th 1205, 1214 [63 Cal.Rptr.3d 99, 162 P.3d 610] (*Castaneda*).) Here, the trial court granted defendants' motion for judgment on the pleadings. However, with respect to plaintiffs' negligence cause of action, the court's ruling was based on *evidence* adduced in the Evidence Code section 402 hearing held in limine. Insofar as the ruling addressed evidence, it went beyond the four corners of the pleadings. Thus, the proceeding below was the functional equivalent of a motion and order for

nonsuit. (See *Mechanical Contractors Assn. v. Greater Bay Area Assn.* (1998) 66 Cal.App.4th 672, 676 [78 Cal.Rptr.2d 225] ["In reviewing the propriety of the order granting GBA's motion *in limine*, we will apply the standard of review applicable to an order granting a nonsuit."].)

"On review of a judgment of nonsuit, as here, we must view the facts in the light most favorable to the plaintiff[s]. '[C]ourts traditionally have taken a very restrictive view of the circumstances under which nonsuit is proper. The rule is that a trial court may not grant a defendant's motion for nonsuit if plaintiff[s'] evidence would support a jury verdict in plaintiff[s'] favor. [Citations.] [¶] In determining whether plaintiff[s'] evidence is sufficient, the court may not weigh the evidence or consider the credibility of witnesses. Instead, the evidence most favorable to plaintiff[s] must be accepted as true and conflicting evidence must be disregarded. The court must give "to the plaintiff[s'] evidence all the value to which it is legally entitled, . . . indulging every legitimate inference which may be drawn from the evidence in plaintiff[s'] favor . . . ." ' [Citation.] The same rule applies on appeal from the grant of a nonsuit. [Citation.]" (*Castaneda, supra,* 41 Cal.4th at pp. 1214–1215.) Consequently, all of defendants' evidence adduced at the Evidence Code 402 hearing that contradicted plaintiffs' evidence must be disregarded. Stated another way, to the extent that evidence was presented that disputed plaintiffs' evidence, the case must go to the jury.

  b.   *The duty of landlords to prevent third party criminal acts on their premises*

To succeed in a negligence action, the plaintiff must show that (1) the defendant owed the plaintiff a legal duty, (2) the defendant breached the duty, and (3) the breach proximately or legally caused (4) the plaintiff's damages or injuries. (*Ann M., supra,* 6 Cal.4th at p. 673.) The existence of duty is a question of law for the court. (*Id.* at p. 674.)

Our Supreme Court has clearly articulated "the scope of a landowner's duty to provide protection from foreseeable third party [criminal acts] . . . . [It] is determined in part by balancing the foreseeability of the harm against the burden of the duty to be imposed. [Citation.] ' "[I]n cases where the burden of preventing future harm is great, a high degree of foreseeability may be required. [Citation.] On the other hand, in cases where there are strong policy reasons for preventing the harm, or the harm can be prevented by simple means, a lesser degree of foreseeability may be required." [Citation.]' [Citation.] . . . [D]uty in such circumstances is determined by a balancing of 'foreseeability' of the criminal acts against the 'burdensomeness, vagueness, and efficacy' of the proposed security measures. [Citation.]" (*Ann M., supra,* 6 Cal.4th at pp. 678–679, quoting from *Gomez v. Ticor* (1983) 145 Cal.App.3d

622, 631 [193 Cal.Rptr. 600], disapproved on another point in *Sharon P. v. Arman, Ltd.* (1999) 21 Cal.4th 1181, 1193 [91 Cal.Rptr.2d 35, 989 P.2d 121].)

The higher the burden to be imposed on the landowner, the higher the degree of foreseeability is required. (*Sharon P. v. Arman, Ltd., supra,* 21 Cal.4th at p. 1195, disapproved on other grounds in *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 853, fn. 19 [107 Cal.Rptr.2d 841, 24 P.3d 493]; *Delgado v. Trax Bar & Grill* (2005) 36 Cal.4th 224, 243 [30 Cal.Rptr.3d 145, 113 P.3d 1159] (*Delgado*); *Castaneda, supra,* 41 Cal.4th at pp. 1213–1214.) A "*high degree* of foreseeability is required in order to find that the scope of a landlord's duty of care includes the hiring of security guards . . . [because the] monetary costs of security guards is not insignificant" and "the obligation . . . is not well defined." (*Ann M., supra,* 6 Cal.4th at p. 679, italics added.) The burden of hiring security guards is "so high in fact, that the requisite foreseeability to trigger the burden could rarely, if ever, be proven without prior similar incidents. [Citation.]" (*Wiener v. Southcoast Childcare Centers, Inc.* (2004) 32 Cal.4th 1138, 1147 [12 Cal.Rptr.3d 615, 88 P.3d 517], citing *Ann M., supra,* at p. 679.)

The plaintiff in *Ann M.* was raped by an unknown assailant at her place of employment, a store located in a shopping center. (*Ann M., supra,* 6 Cal.4th at pp. 670–671.) At issue in that case was whether the scope of the duty owed by the shopping center owner to maintain its common areas in a reasonably safe condition included providing security guards in those areas. (*Id.* at p. 670.) The Supreme Court held, under the facts of that case, that the owner did not owe a duty to provide security guards in the common areas. (*Ibid.*) The court explained that the plaintiff conceded that the prior incidents "were not similar in nature to the violent assault that she suffered. Similarly, none of the remaining evidence presented by Ann M. is sufficiently compelling to establish the high degree of foreseeability *necessary to impose upon Pacific Plaza a duty to provide security guards in the common areas.* Neither the evidence regarding the presence of transients nor the evidence of the statistical crime rate of the surrounding area is of a type sufficient to satisfy this burden." (*Id.* at p. 680, italics added, fn. omitted.)

Next, the Supreme Court held in *Sharon P. v. Arman, Ltd., supra,* 21 Cal.4th 1181, that where there had been no assaults on the premises in 10 years, the plaintiff's violent third party sexual assault in a commercial underground parking garage was not sufficiently foreseeable to justify requiring the landlord to hire patrolling security guards. (*Id.* at pp. 1185, 1195.) *Sharon P.* rejected the plaintiff's argument for a "per se rule of foreseeability in cases involving underground parking structures." (*Id.* at p. 1192.) It likewise held that seven armed robberies occurring at the bank on the ground floor above the garage were insufficient to impose a duty of care on the defendants to

undertake the *onerous security measures of hiring security guards* for the garage. (*Id.* at p. 1195.) *Sharon P.* found that bank robberies "were not sufficiently similar to the sexual assault crime to establish a high degree of foreseeability. Nor would such a duty be found if the assault on plaintiff had occurred in other areas of the office building instead of the garage (e.g., in a common hallway or at plaintiff's place of business)." (*Ibid.*)

More recently, in *Delgado*, one of the bar's two "bouncers" noticed hostile stares between the plaintiff bar patron and other bar patrons and concluded a fight was imminent. The bouncer asked the plaintiff to leave. Once in the parking lot, the plaintiff was accosted by 12 to 20 men. (*Delgado, supra*, 36 Cal.4th at p. 231.) The Supreme Court held that "only when 'heightened' foreseeability of third party criminal activity on the premises exists—shown by prior similar incidents or other indications of a reasonably foreseeable risk of violent criminal assaults in that location—does the scope of a business proprietor's special-relationship-based duty *include an obligation to provide guards* to protect the safety of patrons. [Citations.]" (*Id.* at p. 240, fn. omitted.)

*Delgado* went on to explain that *Ann M.*'s "progeny . . . expressly reaffirm the sliding-scale balancing formula . . . under which we have recognized that, as a general matter, imposition of a high burden requires heightened foreseeability, but a minimal burden may be imposed upon a showing of a lesser degree of foreseeability. [Citations.]" (*Delgado, supra*, 36 Cal.4th at p. 243.) Such a sliding-scale balancing formula is defined by the Supreme Court by the following principles: "In circumstances in which the burden of preventing future harm caused by third party criminal conduct is great or onerous (as when a plaintiff, such as in *Ann M.*, asserts the defendant had a legal duty to provide *guards or undertake equally onerous measures*, or as when a plaintiff, such as in *Sharon P.* or *Wiener*, asserts the defendant had a legal duty to *provide bright lighting, activate and monitor security cameras, provide periodic 'walk-throughs' by existing personnel*, or provide stronger fencing), heightened foreseeability—shown by prior similar criminal incidents or other indications of a reasonably foreseeable risk of violent criminal assaults in that location—will be required." (*Delgado, supra*, at p. 243, fn. 24, italics added.) However, the Supreme Court specifically contrasted those "cases in which harm can be prevented by simple means or by imposing merely minimal burdens, only 'regular' reasonable foreseeability as opposed to heightened foreseeability is required." (*Ibid.*)

This analytical approach was confirmed by the Supreme Court in *Castaneda, supra*, 41 Cal.4th 1205: " 'First, the court must determine the specific measures the plaintiff asserts the defendant should have taken to prevent the harm. This frames the issue for the court's determination by

defining the scope of the duty under consideration. Second, the court must analyze how financially and socially burdensome these proposed measures would be to a landlord, which measures could range from minimally burdensome to significantly burdensome under the facts of the case. Third, the court must identify the nature of the third party conduct that the plaintiff claims could have been prevented had the landlord taken the proposed measures, and assess how foreseeable (on a continuum from a mere possibility to a reasonable probability) it was that this conduct would occur. Once the burden and foreseeability have been independently assessed, they can be compared in determining the scope of the duty the court imposes on a given defendant. The more certain the likelihood of harm, the higher the burden a court will impose on a landlord to prevent it; the less foreseeable the harm, the lower the burden a court will place on a landlord.' [Citation.] Again, other *Rowland* [*v. Christian* (1968) 69 Cal.2d 108 [70 Cal.Rptr. 97, 443 P.2d 561]] factors may come into play in a given case, but the balance of burdens and foreseeability is generally primary to the analysis. [Citation.]" (*Castaneda, supra*, at p. 1214, quoting from *Vasquez v. Residential Investments, Inc.* (2004) 118 Cal.App.4th 269, 285 [12 Cal.Rptr.3d 846], fns. omitted.)[2]

With these rules in mind, we turn to the evidence presented in the instant case.

### c. *The trial court erred in finding defendants owed no duty.*

Referring to the first step of the analysis, i.e., the specific security measures that plaintiffs proposed defendants should have taken, the record shows that plaintiffs requested minimal changes: Professor Katz recommended (1) moving the existing security gates from the back of the access road, *or* (2) installing "very similar" gates before the visitor and leasing office parking lots. An additional gate could be "any gate . . . —that would *not necessarily* impede climbing over it. It wouldn't have spikes or—or be unusually high. It would just define a property boundary . . ." "[v]ery similar to the gates they have . . . ." (Italics added.) Indeed, *Professor Katz did not reject swing-arm gates*. Any gate could remain open during the day to allow business in the leasing office. Plaintiffs clearly stated they were *not* asking for the hiring of a guard or for any form of ongoing surveillance or monitoring. Furthermore,

---

[2] Although *Castaneda* was decided after the judgment was entered in this case, it is declarative of existing law and so it applies to this case. (See *Newman v. Emerson Radio Corp.* (1989) 48 Cal.3d 973, 981–982 [258 Cal.Rptr. 592, 772 P.2d 1059] ["[w]ith few exceptions and even after expressly considering suggestions to the contrary, California courts have consistently applied tort decisions retroactively even when those decisions declared new causes of action or expanded the scope of existing torts in ways defendants could not have anticipated prior to our decision."].) Furthermore, *Castaneda* quotes from *Vasquez v. Residential Investments, Inc., supra*, 118 Cal.App.4th 269, which predates the trial court's decision in this case and so it too applies to this case.

because existing fencing extends around almost the entire perimeter of the property, only a "very minor"[3] extension over a "very small area" would be necessary to close the fencing gap, Professor Katz testified, and could be achieved by merely mounding dirt. Viewing the record as we are required (*Castaneda, supra*, 41 Cal.4th at pp. 1214–1215), the trial court's finding that plaintiffs had proposed "enclosing the entire complex, moving the gates, *and* installing some system *or a guard* that would let invited guests enter the complex at night" overstates the security measures sought.[4] (Italics added.)

The second issue requires the court to analyze how financially and socially onerous the proposed measures would be to the landlord. The measures "could range from minimally burdensome to significantly burdensome under the facts of the case." (*Castaneda, supra*, 41 Cal.4th at p. 1214.) The evidence adduced at the hearing was that the cost to defendants to install the two security gates barricading the two roads at the back of the property was about $13,050. And plaintiffs suggested using the same gates for the front of the property. Although plaintiffs presented no evidence about the cost of extending the fence, notably Professor Katz testified that would necessitate only a "minor extension," because the property is already almost completely surrounded by walls, *and could even involve merely mounding dirt*. As plaintiffs observed, their proposed security measures involved a one-time expenditure and did not require ongoing surveillance of any kind, or the expenditure of significant funds. We disagree with the court that the proposed security measures were onerous.[5]

■    Turning then to the heart of this case, the third element of foreseeability, plaintiffs demonstrated three prior incidents of sudden, unprovoked, increasingly violent assaults on people in *ungated parking* areas on the Pheasant Ridge premises by strangers in the middle of the night, causing great bodily injury. Professor Katz opined, based on the three incidents, that "the probability is foreseeable here" of plaintiff's attack because in his experience, "you don't get more than this." The evidence of three vicious criminal assaults in the common areas within two years of plaintiff's attack here is more similar and compelling than the evidence in *Ann M., supra*, 6 Cal.4th at page 671 (no evidence landlord had notice of crime on the

---

[3] Plaintiffs also argued that defendants should not have rented parking spaces out to nontenants because that practice had the effect of reducing nonassigned spaces for tenants, forcing tenants to park in the unprotected leasing office lot. However, the evidence shows that Tan was offered the opportunity to rent a garage and turned it down, with the result he may not raise this issue.

[4] Defendants' suggestions that plaintiffs were requesting guards or a " 'continuous barrier' around the perimeter of the almost 21-acre property" is hyperbolic.

[5] Whether these security measures would feasibly have prevented the crime, as defendants contest, goes to the question of causation, not a relevant issue at the Evidence Code section 402 hearing concerning the duty element of negligence.

property), or *Sharon P. v. Arman, Ltd., supra,* 21 Cal.4th at page 1186 (no assaults in 10 years on the premises). We conclude that plaintiffs presented substantial evidence of prior similar incidents or other indications of a reasonably foreseeable risk of violent criminal assaults on the property so as to impose on defendants a duty to provide the comparatively minimal security measures plaintiffs described.

The court here required a heightened showing of foreseeability necessitating nearly identical prior crimes, in part, because the court perceived the proposed security to be onerous. We have already concluded that the actual measures sought were not especially burdensome under the facts of this case. Thus, the court's ruling is erroneous that where none of these incidents involved guns, shootings, attempted carjackings, or attempted murder, the incidents were not sufficiently similar to meet the heightened standard of foreseeability.[6] We addressed this same issue in *Claxton v. Atlantic Richfield Co., supra,* 108 Cal.App.4th 327, where the plaintiff was seriously injured in a vicious, racially motivated attack at a gas station. The record contained evidence of prior robberies, assaults, and gang activity in and around the area. In holding that the plaintiff presented substantial evidence of a reasonably foreseeable risk of violent criminal assaults, we specifically rejected the trial court's ruling requiring evidence of the *same* racially motivated robberies or assaults as that perpetrated on the plaintiff. We stated, "As set forth in *Ann M.* and *Sharon P.,* the test is prior '*similar*' incidents [citations], not prior *identical* incidents. Therefore, it is immaterial whether any prior robberies or assaults at the station were motivated by racial animus, or were merely garden-variety antisocial behavior. Claxton presented substantial evidence of prior robberies and assaults, as well as other indications of a reasonably foreseeable risk of violent criminal assaults at the station." (*Id.* at p. 339, first italics added, second italics in original.) In light of the minimum security measures proposed by plaintiffs here, they have presented substantial evidence of prior, sudden, vicious assaults by a stranger at Pheasant Ridge. It is of no moment that the assaults were not committed with guns where they nonetheless inflected great bodily injury. Plaintiffs demonstrated a reasonably foreseeable risk of violent criminal assaults on the property.[7]

---

[6] Nor are we persuaded by defendants' attempts to distinguish the assaults from the attack on Tan by arguing that none occurred in the same parking lot where Tan was attacked. Professor Katz very conservatively cited evidence of attacks *in common areas of the Pheasant Ridge property only.* (See *Claxton v. Atlantic Richfield Co.* (2003) 108 Cal.App.4th 327, 339 [133 Cal.Rptr.2d 425] [discussing crime *at* the station].)

[7] *Castaneda* does not aid defendants. Although the court required a high degree of foreseeability, it had already explained that the security measures sought, namely, (1) the hiring of security guards and (2) the eviction of gang member tenants, "[could not] be considered a minimal burden." "To establish a duty to evict the [perpetrator-gang members], plaintiff must show that violence *by them* or their guests was highly foreseeable." (*Castaneda, supra,* 41 Cal.4th at pp. 1219–1221.) The other measure requested, refusing to rent to gang members,

Perfect identity of prior crimes to the attack on a plaintiff is not necessary. Under the Supreme Court's "sliding-scale balancing formula," heightened foreseeability is required to impose a high burden whereas some showing of a "lesser degree of foreseeability" is sufficient where a minimal burden is sought to be imposed on the defendants. (*Delgado, supra,* 36 Cal.4th at p. 243.) Foreseeability lies on a "continuum from a mere possibility to a reasonable probability." (*Castaneda, supra,* 41 Cal.4th at p. 1214.) Because plaintiffs have only asked for relatively minimal security measures—ones already taken by defendants in another portion of the property—the degree of foreseeability required here is not especially high. As a matter of law, therefore, the three prior incidents cited are sufficiently similar to make the assault on Tan foreseeable and to place a duty of care on defendants. Accordingly, the trial court erred in ruling that defendants had no duty of care in this case.[8]

II.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

---

would not be "fair or workable . . . ." (*Id.* at p. 1216.) Thus, the two prior incidents of shooting, *neither of which occurred on the property* "did little to establish that gun violence *by those occupants* was a likely occurrence." (*Id.* at p. 1221, italics added.) Here, the measures sought were much less burdensome than evicting a tenant or hiring security guards, and so, as noted, the degree of foreseeability necessary here was correspondingly lower. (*Ibid.*) Other cases relied on by defendants likewise involved requests for considerable security burdens and by comparison, lesser degrees of foreseeability than in the facts in this case. (See *Ann M., supra,* 6 Cal.4th at pp. 670–673; *Wiener v. Southcoast Childcare Centers, Inc., supra,* 32 Cal.4th at pp. 1143, 1147, 1150 [the injury causing event was a " 'highly absurd and bizarre' " occurrence and there had been no evidence the daycare center had ever been the target of violence]; *Rinehart v. Boys & Girls Club of Chula Vista* (2005) 133 Cal.App.4th 419, 435 [34 Cal.Rptr.3d 677] [requesting additional supervisors in playground].) We respectfully disagree with any suggestion to the contrary in *Alvarez v. Jacmar Pacific Pizza Corp.* (2002) 100 Cal.App.4th 1190 [122 Cal.Rptr.2d 890], which was issued before our opinion in *Claxton* reiterating the *Ann M.* rule that prior incidents be *similar,* not identical. (*Claxton v. Atlantic Richfield Co., supra,* 108 Cal.App.4th at p. 339; see also *Alvarez, supra,* at p. 1220 (dis. opn. of Epstein, J.).)

[8] We do not address plaintiffs' alternative theory of negligence, namely, that a duty was created when defendants voluntarily undertook to install security gates at the back of the property. In *Alvarez v. Jacmar Pacific Pizza Corp., supra,* 100 Cal.App.4th 1190, the appellate court rejected the plaintiffs' attempt to alternatively characterize their negligence cause of action against a premises owner as one for negligent undertaking of a duty. (*Id.* at p. 1212.) The court stated: "plaintiffs cannot attempt to circumvent governing decisional law about a commercial enterprise's liability for criminal acts by recasting their claim in some other subtheory of negligence. The dispositive issue remains the foreseeability of the criminal act. Absent foreseeability of the particular criminal conduct, there is no duty to protect the plaintiff from that particular type of harm." (*Ibid.*)

*See footnote, *ante,* page 1087.

## DISPOSITION

The judgment is reversed. Defendants to bear the burden of costs on appeal.

Croskey, Acting P. J., and Kitching, J., concurred.

Respondents' petition for review by the Supreme Court was denied April 29, 2009, S171152.