Filed 12/4/13  Andrade v. Guys & Dolls CA2/4

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| CLAUDIA ANDRADE et al., <br><br>      Plaintiffs and Appellants, <br><br> v. <br><br> GUYS & DOLLS, LLC et al., <br><br>      Defendants and Respondents. | B244265 <br> (Los Angeles County <br> Super. Ct. No. SC111587) |

APPEAL from a judgment of the Superior Court of Los Angeles, Norman P. Tarle, Judge.  Affirmed.

The Mandell Law Firm, Robert J. Mandell and Mara E. J. Burnett for Plaintiff and Appellant.

Chapman, Glucksman, Dean, Roeb & Barger, Arthur J. Chapman and Aneta B. Dubow for Defendants and Respondents Guys & Dolls, LLC, Jason Rimokh and Michael Sutton.

Prindle, Amaro, Goetz, Hillyard, Barnes & Reinholtz, Michael L. Amaro and Sanaz Cherazaie for Defendant and Respondent Champion Personal Services, LLC.

In the underlying action, appellant Claudia Andrade asserted claims for wrongful death and negligent infliction of emotional distress against respondents -- the operators of a nightclub and its security guards -- alleging that they negligently failed to protect her husband, who died while working as a parking valet near the nightclub. The trial court granted respondents' summary judgment motions, concluding that they had no duty to protect appellant's husband, and that their conduct was not a substantial factor in the causation of his death. At the hearing on the motions, the court also denied appellant's request for a continuance to conduct further discovery. We reject appellant's challenges to these rulings, and affirm.

**RELEVANT PROCEDURAL BACKGROUND**

There are no disputes regarding the following facts: In July 2010, respondents Jason Rimokh and Michael Sutton controlled respondent Guys and Dolls, LLC (Guys and Dolls), which operated the Guys and Dolls nightclub in West Hollywood (collectively, the Guys and Dolls parties). Respondent Champion Personal Services, Inc. (CPS), provided unarmed security guard services for the nightclub. Appellant's husband, Juan Gabriel Camargo Cortez, worked as a parking valet for Express Regency Valet Parking, which provided services to the nightclub.[1] At 2:00 a.m. on July 19, 2010, the nightclub closed for the night. Shortly afterward, Camargo died as the result of a shooting that occurred in front of the nightclub.

On February 23, 2011, appellant Claudia Andrade initiated the underlying action against the Guys and Dolls parties. On her own behalf and as guardian ad

2

litem of her children, she asserted claims for wrongful death and negligent infliction of emotional distress. In April 2011, Berkshire Hathaway Homestate Companies (Berkshire) filed a complaint in intervention as the worker's compensation insurer for Camargo's employer, seeking to recover death benefits paid to appellant. In late 2011, appellant's and Berkshire's complaints were amended to name CPS as a "Doe" defendant.

In December 2011, the Guys and Dolls parties filed a motion for summary judgment, contending they owed no duty to Camargo to protect him from the shooting. Later, in May 2012, CPS filed a motion for summary judgment or adjudication, asserting that it also owed no duty of protection to Camargo, and that its conduct was not a substantial factor in causing his death. On August 16, 2012, following a hearing, the trial court granted the motions for summary judgment. On September 7, 2012, judgments of dismissal were entered in favor of respondents and against appellant. This appeal followed.[2]

## DISCUSSION

Appellant contends summary judgment was improperly granted on her complaint. For the reasons explained below, we disagree.

### A. *Standard of Review*

"On appeal after a motion for summary judgment has been granted, we review the record de novo, considering all the evidence set forth in the moving and

---

[1]     Appellant identifies her husband's family name as "Camargo," while respondents identify it as "Cortez." We use the name specified by appellant.

[2]     Although Berkshire opposed respondents' motions for summary judgment, it has not appeared in this appeal.

opposition papers except that to which objections have been made and sustained. [Citation.]" (*Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 334.) Generally, "[s]ummary judgment is proper if there is no triable issue of material fact and the moving party is entitled to summary judgment as a matter of law. (Code Civ. Proc., § 437c.)" (*National Auto. & Cas. Ins. Co. v. Underwood* (1992) 9 Cal.App.4th 31, 36.) In moving for summary judgment, "all that the defendant need do is to show that the plaintiff cannot establish at least one element of the cause of action -- for example, that the plaintiff cannot prove element X." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850, 853 (*Aguilar*).)

Although we independently assess a grant of summary judgment (*Lunardi v. Great-West Life Assurance Co.* (1995) 37 Cal.App.4th 807, 819), our review is subject to two constraints. Under the summary judgment statute, we examine the evidence submitted in connection with a summary judgment motion, with the exception of evidence to which objections have been appropriately sustained. (*Mamou v. Trendwest Resorts, Inc.* (2008) 165 Cal.App.4th 686, 711; Code Civ. Proc., § 437c, subd. (c).) Moreover, our review is governed by a fundamental principle of appellate procedure, namely, that "'[a] judgment or order of the lower court is presumed correct,'" and thus, "'error must be affirmatively shown.'" (*Denham v. Superior Court* (1970) 2 Cal.3d 557, 564, italics omitted, quoting 3 Witkin, Cal. Procedure (1954) Appeal, § 79, pp. 2238-2239.) Appellant thus bears the burden of establishing error on appeal, even though respondents had the burden of proving their right to summary judgment before the trial court. (*Frank and Freedus v. Allstate Ins. Co.* (1996) 45 Cal.App.4th 461, 474.) For this reason, our review is limited to contentions adequately raised in appellant's briefs. (*Christoff v. Union Pacific Railroad Co.* (2005) 134 Cal.App.4th 118, 125-126.)

The two constraints narrow the scope of our inquiry. Here, respondents raised numerous evidentiary objections to the showing proffered by appellant and Berkshire, which the trial court sustained in part and overruled in part. Because appellant does not challenge these rulings on appeal, she has forfeited any contention of error regarding them.

Appellant has also forfeited any contention that summary judgment was improper with respect to her claims, to the extent she fails to challenge the ruling regarding those claims. Because appellant does not separately discuss her claim for negligent infliction of emotional distress, our review does not examine it independently of her wrongful death claim. (*Wall Street Network, Ltd. v. New York Times Co.* (2008) 164 Cal.App.4th 1171, 1177; *Yu v. Signet Bank/Virginia* (1999) 69 Cal.App.4th 1377, 1398; *Reyes v. Kosha* (1998) 65 Cal.App.4th 451, 466, fn. 6.)

B. *Governing Principles*

The principal issues before us concern a business's duty to deploy armed security guards or similar security measures, and the showing required to establish that a breach of that duty caused the plaintiff's alleged injuries.

1. *Scope of a Business's Duties*

Generally, a business's duty to maintain its premises includes duties based on its "special relationship" with invitees, patrons, and tenants. (*Delgado v. Trax Bar & Grill* (2005) 36 Cal.4th 224, 229, 234-241 (*Delgado*); *Ann M. v. Pacific Plaza Shopping Center* (1993) 6 Cal.4th 666 (*Ann M.*), disapproved on another ground in *Reid v. Google, Inc.* (2010) 50 Cal.4th 512, 527, fn. 5; see *Sharon P. v. Arman, Ltd.* (1999) 21 Cal.4th 1181, 1188-1199 (*Sharon P.*), disapproved on other

5

grounds in *Aguilar*, *supra*, 25 Cal.4th at p. 854, fn. 19, and *Reid v. Google, Inc.*, *supra*, 50 Cal.4th at p. 527, fn. 5; *Castaneda v. Olsher* (2007) 41 Cal.4th 1205, 1213 (*Castaneda*).) Although there is ordinarily no duty to protect others from the conduct of third parties, a proprietor's "special relationship" with invitees, patrons, and tenants creates an affirmative duty to protect them from third party misconduct. (*Delgado*, *supra*, 36 Cal.4th at pp. 229, 234-241.) Under this doctrine, businesses are obliged to take reasonable measures to shield the invitees, tenants, and patrons from injurious third party conduct. (*Ibid*.) In each case, the existence and scope of the duty "is a question of law for the court to resolve." (*Castaneda*, *supra*, 41 Cal.4th at p. 1213.)

For purposes of a proprietor's duties, invitees ordinarily include "'business visitor[s]'" that is, persons "'invited to enter or remain on land for a purpose directly or indirectly connected with business dealings with the possessor of the land'" (*O'Keefe v. South End Rowing Club* (1966) 64 Cal.2d 729, 737, quoting Restatement Second of Torts, § 332, subsection (3).) Here, the term "'business visitor'" may encompass workers employed by businesses independent of the proprietor or landowner. (See *O'Keefe v. South End Rowing Club*, *supra*, 64 Cal.2d at p. 737 [repair and delivery workers]; *Hinds v. Wheadon* (1942) 19 Cal.2d 458, 460 [employee of independent contractor hired by landowner]; *Jenson v. Kenneth I. Mullen, Inc.* (1989) 211 Cal.App.3d 653, 657-658 [employees of business hired by landowner].)

In addition, a proprietor may breach the duty to protect even though the injurious third party conduct occurred on property not owned or leased by the proprietor. A proprietor must take reasonable protective measures regarding property under the proprietor's control, regardless of whether the proprietor owns or leases the property. (*Morris v. De La Torre* (2005) 36 Cal.4th 260, 274;

6

*Southland Corp. v. Superior Court* (1988) 203 Cal.App.3d 656, 664-669.) This rule encompasses public land over which the proprietor exercises control. (*Alcaraz v. Vece* (1997) 14 Cal.4th 1149, 1170-1171.)

As our Supreme Court explained in *Castaneda*, a balancing test determines the scope of a proprietor's duty to protect invitees, patrons, and tenants from third party misconduct. (*Castaneda*, *supra*, 41 Cal.4th at p. 1214.) "'First, the court must determine the specific measures the plaintiff asserts the defendant should have taken to prevent the harm. This frames the issue for the court's determination by defining the scope of the duty under consideration. Second, the court must analyze how financially and socially burdensome these proposed measures would be to a landlord . . . . Third, the court must identify the nature of the third party conduct that the plaintiff claims could have been prevented had the landlord taken the proposed measures, and assess how foreseeable (on a continuum from a mere possibility to a reasonable probability) it was that this conduct would occur. Once the burden and foreseeability have been independently assessed, they can be compared in determining the scope of the duty the court imposes on a given defendant. The more certain the likelihood of harm, the higher the burden a court will impose on a landlord to prevent it; the less foreseeable the harm, the lower the burden a court will place on a landlord.'" (*Id*. at p. 1214, quoting *Vasquez v. Residential Investments, Inc.* (2004) 118 Cal.App.4th 269, 285.)

In *Ann M*., *Sharon P.*, and *Delgado*, the Supreme Court examined the circumstances under which a business may be required to hire security guards or implement similar security measures.

### a. *Ann M.*

In *Ann M.*, a shopping mall provided no security guards, even though its tenants complained that transients loitered in the mall's common areas. (*Ann M., supra,* 6 Cal.4th at pp. 670-673.) After a tenant's employee was raped inside the tenant's store, she initiated a negligence action against the mall. (*Id*. at pp. 670-671.) When the mall sought summary judgment on the ground that it lacked a duty to protect the employee, she maintained that violent crimes had occurred within the mall, but offered no evidence that the mall had notice of those incidents. (See *id.* at pp. 679-680.)

In holding that the mall had no duty to hire security guards, the Supreme Court explained that the scope of a landlord's duty "is determined in part by balancing the foreseeability of the harm against the burden of the duty to be imposed." (*Ann M.*, *supra*, 6 Cal.4th at p. 678, quoting *Isaacs v. Huntington Memorial Hospital* (1985) 38 Cal.3d 112, 125.) Because the social costs of requiring landlords to hire private guards are "not insignificant[,] . . . a high degree of foreseeability is required in order to find that the scope of a landlord's duty of care includes the hiring of security guards." (*Ann M.*, *supra*, at p. 679.) In contrast, when """harm can be prevented by simple means, a lesser degree of foreseeability may be required."""" (*Ibid.*) Under these principles, the foreseeability of crimes warranting the hiring of security guards or similarly costly measures can "rarely, if ever," be proven, absent notice to the landlord of prior similar incidents. (*Ibid.*) In a footnote, the court clarified the qualification to the "prior similar incident[]" standard, stating: "It is possible that some other circumstances such as immediate proximity to a substantially similar business establishment that has experienced violent crime on its premises could provide the requisite degree of foreseeability." (*Ibid.*, fn. 7.)

8

b. *Sharon P.*

In *Sharon P.*, the plaintiff was a tenant in an office building, and parked her car in an underground parking structure reserved for the building's tenants. (*Sharon P., supra,* 21 Cal.4th at p. 1185.) After the plaintiff was sexually assaulted in the garage, she asserted negligence claims against the building's owner and the supplier of parking services. (*Id.* at pp. 1185-1186.) In seeking summary judgment on the claims, the defendants maintained that they had no duty to make the garage more secure because no similar incidents had occurred within the parking structure. (*Ibid.*)

The Supreme Court concluded that the defendants had no duty to hire security guards for the parking structure, as there had been no reported incidents of crime within the parking structure for a ten-year period, and the only incidents of crime on the premises consisted of seven bank robberies on the street level of the office building. (*Sharon P., supra*, 21 Cal.4th at p. 1195.) The court rejected the view that the parking structure was "'so inherently dangerous'" that the defendants were required to hire guards despite the absence of prior similar crimes, observing that there was no evidence that underground parking structures were inherently more dangerous than other types of commercial premises. (*Id.* at pp. 1191-1192.)

c. *Delgado*

In *Delgado*, the defendant bar employed two security guards, one positioned inside the bar, and the other in the bar's parking lot. (*Delgado, supra*, 36 Cal.4th at p. 230.) The plaintiff and his wife visited the bar, where four or five other patrons stared at him in an aggressive manner. (*Id.* at pp. 230-231.) Fearful that the staring presaged a fight, the plaintiff pointed it out to the bar's guards and left the bar with his wife. (*Id.* at p. 231.) As they walked to the bar's parking lot, they

were followed by the menacing patrons, who joined up with other men waiting in the parking lot. (*Id*. at pp. 231-232.) When the men began to assault the plaintiff, he ran out of the parking lot and across the street to divert the attackers from his wife. (*Id*. at pp. 231-232, fn. 6.) The attackers followed and beat him with a baseball bat. (*Ibid*.) After the plaintiff prevailed in his negligence suit against the bar, the bar appealed, contending it had no duty to provide security guards, and thus could not be liable for the plaintiff's injuries. (*Id*. at p. 233.)

The Supreme Court explained that a business is ordinarily obliged to maintain guards in an area of its premises only when there is a heightened foreseeability of criminal activity, as shown by a history of similar criminal incidents. (*Delgado*, *supra*, 36 Cal.4th at pp. 236-240.) Under that standard, "[h]eightened foreseeability is satisfied by a showing of prior similar criminal incidents (or other indications of a reasonably foreseeable risk of violent criminal assaults in that location) and does not require a showing of prior nearly identical criminal incidents." (*Id*. at p. 245, italics omitted.)

However, even when a business is not required to hire guards, its special relationship with patrons and invitees may oblige it to deploy its guards -- if it has any -- to protect patrons and invitees in reasonable ways. (*Delgado*, *supra*, 36 Cal.4th at pp. 240-242.) The court stated: "[A] restaurant or bar proprietor . . . has a duty to warn patrons of known dangers [citation] and, in circumstances in which a warning alone is insufficient, has a duty to take other reasonable and appropriate measures to protect patrons or invitees from imminent or 'ongoing' criminal conduct. [Citation.] Such measures may include telephoning the police or 911 for assistance [citation], or protecting patrons or invitees from an imminent and known peril lurking in a parking lot by providing an escort by existing security personnel to a car in that parking lot. [Citations.]" (*Id*. at p. 241.)

10

Applying these principles to the case before it, the court concluded that the bar had no obligation to hire guards to protect against third party assaults, as there was evidence of only a few prior altercations among patrons. (*Delgado*, *supra*, 36 Cal.4th at p. 237.) The court further held that the menacing looks from the plaintiff's assailants required its existing guards to take protective actions that were "reasonable, relatively simple, and minimally burdensome." (*Id.* at pp. 242-247.) These measures included establishing some separation between the plaintiff and the menacing patrons as the plaintiff left the bar, and ensuring that the guard posted in the parking lot maintained the separation. (*Id*. at pp. 244-247.)

### 2. *Causation of Injury*

Even when a business's duty to protect encompasses a particular security measure, the plaintiff must show that its failure to implement that measure was a substantial factor in causing the plaintiff's injuries. (*Saelzler v. Advanced Group 400* (2001) 25 Cal.4th 763, 772-781 (*Saelzler*).) As explained in *Saelzler*, "'claims of abstract negligence'" based on the duty to protect fail when no connection with the alleged injuries is shown. (*Id*. at p. 773, quoting *Sharon P*., *supra*, 21 Cal.4th at pp. 1196-1197.) There, the plaintiff worked for a delivery service, and attempted to deliver a package to an apartment complex located in a high-crime district. (*Id*. at p. 769.) The complex lacked security guards, and its security gate was propped open when the plaintiff entered the complex. (*Ibid*.) Within the complex, three assailants attempted to rape her, and fled. (*Ibid*.) Following the incident, the plaintiff was unable to identify her assailants. (*Ibid*.) When the plaintiff sued the building's owners for negligence, the trial court granted summary judgment in their favor because there was no evidence that any breach of their duty to safeguard the plaintiff caused her injuries. (*Id*. at p. 771.)

11

In affirming summary judgment, the Supreme Court concluded that because there was no evidence that the assailants were trespassers within the apartment complex, the plaintiff failed to show that the defendants' failure to provide guards and lock the security gates was a substantial factor in the causation of the plaintiff's injuries. (*Saelzler*, *supra*, 25 Cal.4th at p. 776.) In so holding, the court concluded that the degree of foreseeability sufficient to establish the duty to provide security measures does not necessarily establish the element of causation. (*Id*. at p. 777.) The court also rejected a purported "rule of common sense" -- namely, that the failure to provide security measures is necessarily a contributing cause of crimes -- because such a rule "would prevent summary judgment on the causation issue in every case in which the defendant failed to adopt increased security measures . . . ." (*Id*. at p. 778, italics omitted.)

C. *Respondents' Evidence*[3]

In seeking summary judgment, respondents submitted evidence supporting the following version of the underlying facts: For approximately one year prior to the shooting, Guys and Dolls leased and operated the nightclub. During that period, there were no instances of shootings, armed violence, or assaults at the nightclub. However, the City of West Hollywood required Guys and Dolls to prevent the nightclub's patrons from acting in a drunken or obtrusive manner that created a nuisance for the neighborhood.

---

[3]     Although the Guys and Dolls parties and CPS filed separate motions for summary judgment, the underlying evidentiary showings contained cross-references, and the trial court viewed the showings collectively in ruling on the motions. As appellant's briefs neither distinguish the showings nor challenge the trial court's procedure, we also summarize respondents' evidence as a single showing.

12

To ensure compliance with that requirement and alcohol-related laws, and to provide security for patrons and invitees, Guys and Dolls hired CPS to provide unarmed security guard services. For Thursdays, Fridays, and Saturdays, Guys and Dolls asked CPS to supply six to eight guards. For Sundays, when the nightclub hosted a special event called "Urban Sunday," Guys and Dolls requested 15 guards. The guards checked identifications at the door and assisted with crowd control within the nightclub; in addition, they ensured that patrons left when the nightclub closed at 2:00 a.m. and did not linger at its entrance. Guys and Dolls did not require the guards to patrol the parking lot area or the valet area.

Prior to the shooting on July 19, 2010, CPS developed standard closing procedures for the "Urban Sunday" event. At approximately 1:55 a.m., CPS placed ropes and stanchions in the curbside area to channel the flow of exiting patrons and prevent them from stepping into the street. Two security guards were positioned in the street to help with the patrons and street traffic. At 2:00 a.m., two more guards were positioned near the nightclub's door to prevent patrons from taking alcoholic drinks with them. Shortly after 2:00 a.m., up to an additional eight guards took positions in front of the nightclub to help with pedestrians and traffic.

In addition, on Sunday nights, Los Angeles County Sheriff's Department deputies often parked patrol cars in front of the nightclub as it closed in order to be a "'presence.'" No specific crime motivated this practice; their intent was to regulate traffic and crowds. They also routinely patrolled and parked in front of other nightclubs and bars in the West Hollywood area.

On Sunday, July 19, 2010, Camargo worked as a parking valet for Express Regency Valet Parking, which provided services to the nightclub and a nearby Jerry's Deli. CPS assigned 15 guards to the nightclub. During the evening, four guards were positioned at the front door, and three to four other guards took

positions or roamed outside the nightclub. When the nightclub closed, CPS followed its standard procedures.

At closing time, Roland Perez, a CPS guard, was posted outside the nightclub's front door to help with crowd and traffic control. As the nightclub closed, Perez saw a man walking toward the nightclub as he crossed the street in front of it. Once across the street, the man grabbed a chain from an individual standing outside the nightclub and the nearby Jerry's Deli. A physical altercation began between the assailant and his victim. Perez began walking toward the altercation, and called for assistance from other CPS guards on his radio. Within one minute after the altercation began, the assailant fired several shots from a gun. Perez, who was unarmed, took cover. The assailant fled into a waiting vehicle, which drove away. One of the gunshots killed Camargo, who was near the nightclub. The assailant was never identified.

### D. *Appellant's Showing*[4]

Regarding the circumstances surrounding the shooting, appellant did not materially challenge Perez's account of the altercation or identify the assailant.[5] Nor did she provide evidence regarding the identity of the man whose chain the assailant grabbed.[6] However, appellant submitted evidence that on the night of the

---

[4]  Our summary includes Berkshire's showing, as the trial court considered that evidence in ruling on the summary judgment motions. However, we disregard other evidence to which the trial court sustained objections and which it excluded from its analysis.

[5]  Although appellant purported to dispute Perez's account, she offered evidence suggesting only that Perez was at the nightclub's front door -- rather than outside it -- when the altercation began.

[6]  On appeal, appellant identifies this individual as Eric Treggs. However, no evidence supporting that identification was submitted in connection with the summary
*(Fn. continued on next page.)*

shooting, no deputy sheriffs parked their patrol cars in front of the nightclub when it closed, as they were busy elsewhere. In addition, she offered evidence that according to the nightclub's security camera recordings, only six guards were outside the nightclub from 2:00 a.m. until the incident, which occurred at 2:09 a.m.

To raise triable issues regarding respondents' duty to protect and the adequacy of their security measures, appellant submitted the nightclub's conditional use permit, which required it to provide "adequate security to ensure safety . . . in the surrounding area," including "security services to patrol the premises, monitor the queue of waiting patrons, and maintain orderly movement of pedestrians." Appellant also pointed to evidence regarding crimes in the nightclub's area, including an event summary and a "RAPS" report from the Los Angeles County Sheriff's Department, which identified arrests and incidents of potential crime from May 2009 to January 2012. Additionally, appellant submitted deposition testimony from three police officers.

Los Angeles County Sheriff's Department Sergeant Joseph Trimarchi stated that at the nightclub, minors had been arrested for underage drinking. In addition, he was aware that in June 2008, an incident involving the possession of handguns occurred within the nearby Jerry's Deli. However, Trimarchi knew little about the incident, as a different law enforcement agency responded to it.

Deputy Sheriff Daniel Riordan stated that from 2007 to 2011, he patrolled the nightclub's area, and responded to five to ten "fight calls" at the nightclub, some of which "rose to the occasion of becoming what [the officers] considered assault with a deadly weapon or grievous bodily injury," that is, "a felony type of

judgment motions. As noted below (see pt. G., *post*), at the hearing on the summary judgment motions, appellant requested a continuance in order to conduct Treggs's deposition, but made no offer of proof regarding his potential testimony.

fight." During that period, he made between 10 and 15 arrests related to the nightclub for underage drinking and misdemeanor battery. Riordan also stated that the "Urban Sunday" event attracted members of a local street gang.

Deputy Sheriff David Hernandez stated that the nightclub had initially attracted "high-end people," but went "downhill" and began to attract "a certain group." According to Hernandez, when any club attracted gang members, deputy sheriffs parked their cars in front of it. He had responded to three calls regarding the Guys and Dolls nightclub involving altercations, each of which concerned a fistfight.[7] He also recalled that two years before the shooting, the nearby Jerry's Deli was shut down temporarily "because there was a guy supposedly with a gun in there."

### E. *Trial Court's Rulings*

In seeking summary judgment, the Guys and Dolls parties contended they had no duty to protect Camargo, arguing (1) that he was neither a patron nor an invitee of the nightclub, (2) that the incident did not take place on the nightclub's premises, and (3) that there were no prior similar incidents warranting the implementation of security measures to protect Camargo from a shooting. In a 21-page ruling, the trial court declined to address the first two contentions, reasoning that the third contention was dispositive. Following a detailed examination of the police records and other evidence, the trial court concluded that there were no triable issues regarding the existence of "prior similar incidents" sufficient to

---

[7] In addition to the deposition testimony from the three officers, appellant submitted a declaration from R. Bruce Ramm, a security expert, who opined that respondents' security measures were inadequate for the "'urban crowd'" that attended the "Urban Sunday" events.

impose a duty to protect Camargo. As the court noted, the only prior gun-related occurrence was the June 2008 incident in the Jerry's Deli, during which no one was apparently injured.

CPS sought summary judgment on the ground that it had no duty to protect Camargo, and also maintained that its conduct was not a substantial factor in causing Camargo's death. In granting CPS's motion for summary judgment, the trial court relied on its analysis regarding the Guys and Dolls parties' duty to protect. In addition, the court determined that appellant could not establish the element of causation, concluding that there was no evidence that positioning more of the existing guards at the front of the nightclub, or making their presence more visible, was likely to have prevented the shooting. The court stated: "[I]n our case, similarly, the assailant's identity is unknown. It is not known whether he was a club patron, or whether he was in the area for other reasons. Nothing about the assailant is known, so it would be impossible to know what could have deterred him. Finding that more security guards at the [nightclub] would have deterred the assailant would require a jury to engage in pure speculation and conjecture . . . ."

F.  *Analysis*

On appeal, appellant maintains that the rulings on the summary judgment motions cannot be affirmed on any ground asserted in the motions.  We conclude that summary judgment was properly granted on the grounds identified by the trial court.  As explained below, appellant failed to show that respondents had a duty to hire armed guards to protect Camargo from the shooting; in addition, she failed to show the absence of less burdensome security measures, such as the presence of more of the existing guards in front of the nightclub, was a substantial factor in causing Camargo's death.[8]

### 1.  *No Duty to Hire Armed Guards*

In view of *Castaneda*, we first identify "'the specific measures'" that appellant proposes were required under the purported duty to protect Camargo. (*Castaneda, supra*, 41 Cal.4th at p. 1214.)  Appellant's principal contention is that the Guys and Dolls parties had a duty to provide a specific level of security for Urban Sunday events -- namely, the level achieved by the presence of the CPS guards *and* the deputy sheriffs in their patrol cars -- even though respondents did not arrange for the presence of the deputy sheriffs.  According to appellant, to maintain the requisite level of security, the Guys and Dolls parties were required to ensure the presence of armed guards when the deputy sheriffs' patrol cars were absent.

In support of this contention, appellant asserts that the nightclub's conditional use permit "effectively mandated" the positioning of guards near the

---

[8]     Because the rulings on the summary judgments are properly affirmed on these grounds, we do not address or decide whether Camargo was an invitee or whether the shooting's location was under respondents' control, for purposes of the duty to protect.

18

parking valet stand and "armed patrols." She states: "[S]ecurity guards and armed patrol[s] were routinely out front by the valet stand at closing time on Urban Sundays . . . . [appellant] do[es] not seek extraordinary security measures, but rather only those measures [respondents] normally had in place." She further maintains that respondents had "grown dependent on armed police patrols for its Urban Sundays events," and had neither an armed patrol of their own nor a contingency plan for armed security on Urban Sundays when the deputy sheriffs were not there.

At the outset, we observe that the nightclub's conditional use permit did not expressly mandate the presence of armed patrols or similar measures. The permit required that "the property be serviced with adequate security to ensure safety while operating the bar, and in the surrounding area. In addition, it specified that the nightclub must have "security services to patrol the premises, monitor the queue of waiting patrons, and maintain the orderly movement of pedestrians." Nothing in the permit established that the requisite "adequate security" necessarily included armed patrols.

We therefore examine appellant's proposed security measures under the *Castaneda* test. To begin, the measures would be burdensome, as they would effectively oblige the Guys and Dolls parties to hire armed patrols -- or provide additional security measures equivalent to the presence of the deputy sheriffs -- for Sunday events.[9] Nothing before us suggests the Guys and Doll parties had any control over whether the deputy sheriffs parked in front of the nightclub. On the contrary, Deputy Sheriff Hernandez testified that the deputy sheriffs decided when it was appropriate to maintain a "presence" in front of a nightclub. Accordingly, to

19

ensure the presence of armed patrols (or other measures equivalent to armed patrols), the Guys and Dolls parties would have to hire armed patrols (or supply the equivalent measures).

Because the proposed measures would be burdensome, their imposition requires a high degree of foreseeability of criminal activity, as shown by prior similar incidents of which respondents had notice. (*Delgado*, *supra*, 36 Cal.4th at pp. 236-240; *Ann M.*, *supra*, 6 Cal.4th at p. 679.) That was not demonstrated here. Regarding the shooting that caused Camargo's death, the evidence shows only that an unknown assailant crossed the street in front of the nightclub, tried to take a chain from an unidentified individual standing on the sidewalk, and fired a gun. Nothing in the parties' showings establishes that either the assailant or his intended victim was a patron or invitee of the nightclub.

We agree with the trial court that the shooting was materially dissimilar from any other incident that had occurred in or near the nightclub while the Guys and Dolls parties operated it. Regarding the nightclub itself, the police records disclosed that for the 14-month period prior to Camargo's death, the only incidents reported were ones involving underage drinking, public intoxication, failure to check identities, misdemeanor batteries, and misconduct of similar gravity. As the trial court remarked, the incidents appeared to be conduct that the existing security guards could handle. Furthermore, regarding the nightclub's environs, the sole gun-related incident occurred inside the Jerry's Deli over two years before the shooting, but there was no evidence that the gun was fired or that anyone was injured. The record thus shows neither "similar criminal incidents" nor "other

---

**9** Regarding this matter, the record contains evidence that hiring armed guards would have imposed additional security expenses on the Guys and Dolls parties.

indications of a reasonably foreseeable risk of violent criminal assaults" sufficient to satisfy the requirement for heightened foreseeability. (*Delgado*, *supra*, 36 Cal.4th at p. 245, italics omitted.)

In an effort to satisfy that requirement, appellant directs our attention to an incident involving a taser at the Guys and Dolls nightclub, and a stabbing in the Rainbow Club, which is located in West Hollywood.[10] In addition, appellant notes the evidence that gang members may have attended the "Urban Sunday" events at the nightclub. She argues that the presence of gang members, coupled with the arrests and crimes in and near the nightclub, was sufficient to warrant the imposition of those measures. We disagree.

In our view, the two incidents do not satisfy the "prior similar incidents" standard. Regarding the first incident, the pertinent "RAPS" report states only that in January 2010, the nightclub's staff saw a man carrying a taser in front of the nightclub, and the guards "evacuat[ed the] premises." The record otherwise discloses no evidence that the taser was used, that anyone was injured, or that an arrest was made. The incident is thus unlike the shooting that resulted in Camargo's death.

Regarding the second incident, Deputy Sheriff Riordan testified that there was a stabbing at the Rainbow Club "at the very early onset of [his] patrol term" in West Hollywood, which ran from 2007 to 2011. In view of Riordan's testimony, the incident appears to have occurred well before the Guys and Dolls parties began operating the nightclub in 2009. In any event, no evidence was presented that

---

**10** Appellant also points to a purported incident inside the nightclub involving an assault with an unspecified "'tool.'" However, because the trial sustained respondents' objections to appellant's evidence regarding the incident, we exclude the incident from our review.

21

respondents had notice of the incident. Nor was evidence presented that the two clubs were even close to each other. Because there was no showing of notice or that the Guys and Dolls nightclub was "immediate[ly] proxim[ate] to a substantially similar business establishment that . . . experienced violent crime on its premises," the second incident does not satisfy the "similar prior incident standard." (*Ann M*., *supra*, 6 Cal.4th at p. 679 & fn 7.)

Nor does the evidence identified by appellant, viewed collectively, satisfy that standard. As explained in *Ann M*., because "random, violent crime is endemic in today's society," and few locales open to the public are free from the probability of violent crime, the "prior similar incident" standard is necessary to regulate the imposition of duties on proprietors to protect invitees and patrons from crime. (*Ann M., supra,* 6 Cal.4th at pp. 678-679.) Although the evidence may show that the nightclub is subject to the possibility of violent crime, it is insufficient to support the imposition of the security measures proposed by appellant.[11]

Appellant's reliance on *Tan v. Arnel Management Co*. (2009) 170 Cal.App.4th 1087 and several other decisions is misplaced. In *Tan*, the plaintiff lived in an apartment complex whose overflow parking area was surrounded by fences but lacked security gates. (*Id.* at pp. 1090-1091, 1099.) When the plaintiff returned home, he was forced to park in the overflow area because he could find no free space within the complex's secured perimeter, and was subjected to a carjacking during which he was shot. (*Ibid*.) Although there had been three prior attacks in the overflow area, including two assaults with a deadly weapon or force likely to cause great bodily injury, the trial court found that the owners of the

---

[11]     For similar reasons, the evidence is insufficient to establish that the night club was "so inherently dangerous" that it was exempt from the "prior similar incidents" standard. (*Sharon P*., *supra*, 21 Cal.4th at pp. 1191-1192.)

complex had no duty to provide security gates for the overflow area, reasoning that none of the prior incidents had involved a gun. (*Id*. at p. 1094.) In reversing, the appellate court concluded that the three prior incidents were sufficiently similar to the carjacking to warrant the use of security gates, which were not costly to install. (*Id*. at pp. 1098-1100.) In contrast, as explained above, appellant identified no prior incidents sufficiently similar to the shooting that warranted the hiring of armed guards for Sunday events.

The remaining decisions upon which appellant relies stand for the proposition that even when a business is not obliged to hire security guards, its existing guards must respond reasonably to an incident as it develops. (*Delgado*, *supra*, 36 Cal.4th at pp. 242-247 [guard was obliged to separate antagonistic patrons to deter altercation]; *Taylor v. Centennial Bowl, Inc.* (1966) 65 Cal.2d 114, 122-124 [guard was required to escort female patron to car to deter potential assault by male patron who engaged in threatening conduct]; *Trujillo v. G.A. Enterprises, Inc.* (1995) 36 Cal.App.4th 1105, 1109 [guard was required to separate antagonistic patrons to deter impending fight]; *Marois v. Royal Investigation & Patrol, Inc.* (1984) 162 Cal.App.3d 193, 202 [guards were required to ensure that patron obeyed their order to leave the business's premises].) Here, the nightclub's guards discharged this duty: when the assailant attacked his original victim, Perez moved toward the altercation to halt it, and called for assistance. Due to the sudden onset of the incident, no other reasonable responses were available to him. In sum, respondents had no duty to ensure the presence of armed patrols (or equivalent measures), as proposed by appellant.

## 2. *No Causation*

23

Appellant also suggests that respondents were obliged to implement less burdensome measures to deter the shooting that resulted in Camargo's death. She argues that more of the existing guards should have been positioned in front of the nightclub, noting that as few as 4 or 5 guards may have been at the nightclub's entrance, contrary to the nightclub's standard procedure, which required the positioning of up to 11 or 12 guards in front of the nightclub.

We agree with the trial court that appellant has not shown that the absence of more unarmed guards was a substantial factor in causing Camargo's death. As in *Saelzler*, because the assailant's identity and motivations are unknown, there is no evidence that the presence of a greater number of unarmed guards in front of the nightclub -- or even the presence of armed guards -- would have prevented his attack. Given the suddenness of the assault, there is nothing to suggest that an additional number of guards could have intervened in any way to prevent Camargo's death. It is thus speculation that the less burdensome measures that appellant proposes would have been effective to prevent Camargo's death. (Compare *Raven H. v. Gamette* (2007) 157 Cal.App.4th 1017, 1026-1030 [jury could reasonably find that because assailant entered plaintiff's apartment through window, the absence of window-related security measures provided to other tenants was a substantial factor in causing plaintiff's injuries].) In sum, summary judgment was properly granted.[12]

---

[12] We recognize that the trial court, in granting summary judgment in favor of the Guys and Dolls parties, declined to do so on the ground that appellant had failed to establish the element of causation, as the Guys and Dolls parties raised this contention only in their reply to appellant's opposition. However, on appeal, we may affirm summary judgment on any ground properly supported by the record, provided the parties received an adequate opportunity to discuss that ground before the trial court (*California School of Culinary Arts v. Lujan* (2003) 112 Cal.App.4th 16, 22, and on appeal (Code Civ. Proc., § 437c, subd. (m)(2)). That requirement is satisfied here, as the issue of

*(Fn. continued on next page.)*

24

G. *Continuance*

Appellant contends she was improperly denied a continuance. At the hearing on the summary judgment motions, she sought a continuance to conduct the depositions of Reymundo Benitiz, a parking valet, and Eric Treggs, whom she identifies on appeal as the assailant's original victim. She argues that the court erred in denying her request. We disagree.

"The [summary judgment] statute mandates a continuance of a summary judgment hearing upon a good faith showing by affidavit that additional time is needed to obtain facts essential to justify opposition to the motion. [Citations.] Continuance of a summary judgment hearing is not mandatory, however, when no affidavit is submitted or when the submitted affidavit fails to make the necessary showing . . . . [Citations.] Thus, in the absence of an affidavit that requires a continuance . . . , we review the trial court's denial of appellant's request for a continuance for abuse of discretion." (*Cooksey v. Alexakis* (2004) 123 Cal.App.4th 246, 253-254.)[13]

In seeking summary judgment, the Guys and Dolls parties asserted that the assailant's identity was unknown. In February 2012, after the Guys and Dolls parties filed their motion for summary judgment, appellant filed a motion for an order to compel the deposition of Treggs, who had failed to appear at his

causation was fully discussed before the trial court in the context of CPS's summary judgment motion, and appellant's briefs on appeal also address it.

[13] The summary judgment statute provides: "If it appears from the affidavits submitted in opposition to a motion for summary judgment or summary adjudication or both that facts essential to justify opposition may exist but cannot, for reasons stated, then be presented, the court shall deny the motion, or order a continuance to permit affidavits to be obtained or discovery to be had or may make any other order as may be just." (Code Civ. Proc., § 437c, subd. (h).)

deposition. Although the trial court apparently issued the order, Treggs did not appear for a deposition. In April 2012, appellant opposed the Guys and Dolls parties' request for a continuance.

Later, on May 4, 2012, CPS filed its motion for summary judgment or adjudication, which also asserted that the assailant's identity was unknown. In arguing that appellant could not establish the element of causation, the motion noted that the shooting was perpetrated "by an unknown assailant who was brazen enough to pull a gun in front of a large crowd of witnesses," and asserted, "It is unknown what, if anything, would have prevented this thug from acting in such a depraved manner." In opposition to both summary judgment motions, appellant's separate statements acknowledged that the assailant's unknown identity was an undisputed fact.

On July 18, 2012, at the hearing on respondents' motions, Robert Mandell, appellant's counsel, asked for a continuance after the trial court stated its intention to grant the motions. The request was made orally, and was unsupported by any declaration. In support of the request, Mandell argued that he needed time to obtain a bench warrant for Treggs, and to conduct Benitiz's deposition. Mandell described the difficulties he had encountered in securing Treggs's deposition, and said that he was unaware that the assailant's identity was a potential "sticking point" until he saw the trial court's tentative ruling. He did not describe the testimony Treggs might provide. Indeed, when defense counsel asserted that neither he nor Mandell had any idea what Treggs might say regarding the shooting or the identity of the assailant, Mandell did not disagree. Mandell further maintained that although he had not been able to locate Benitiz in order to conduct his deposition, he had a statement from Benitiz that he saw the assailant and the man with the chain arguing as they left the nightclub, shortly before the altercation

26

in front of the nightclub.  Mandell argued that if the trial court regarded the assailant's status as a nightclub patron as relevant to the propriety of summary judgment, he required a continuance in order "to spend the big bucks and find [Benitiz] . . . ."  The court denied the continuance.

We see no error in this ruling.  Generally, a party seeking a continuance must show that the facts to be obtained are essential to opposing the motion, that there is reason to believe such facts may exist, and that additional time is needed to obtain these facts.  (*Wachs v. Curry* (1993) 13 Cal.App.4th 616, 623, disapproved on another point in *Marathon Entertainment, Inc. v. Blasi* (2008) 42 Cal.4th 974, 987-988.)  It is "not sufficient under the statute merely to indicate further discovery or investigation is contemplated."  (*Roth v. Rhodes* (1994) 25 Cal.App.4th 530, 548.)  Thus, declarations offered in support of a continuance ordinarily should show:  "(1)  'Facts establishing a likelihood that controverting evidence may exist and why the information sought is essential to opposing the motion'; (2) 'The specific reasons why such evidence cannot be presented at the present time'; (3) 'An estimate of the time necessary to obtain such evidence'; and (4) 'The specific steps or procedures the opposing party intends to utilize to obtain such evidence.'"  (*Johnson v. Alameda County Medical Center* (2012) 205 Cal.App.4th 521, 532, italics omitted, quoting (Weil & Brown, Cal. Practice Guide: Civil Proc. Before Trial (The Rutter Group) ¶ 10:207.15, p. 10-83 (rev. #1, 2011).)

Here, no declaration accompanied appellant's request, and her counsel otherwise failed to demonstrate an adequate basis for a continuance.  Although CPS's summary judgment motion relied on the fact that the assailant's identity and motivation were unknown to show that causation could not be established, appellant's counsel offered no cogent explanation for failing to secure Treggs's testimony while the summary judgment motions were pending.  Furthermore,

27

appellant's counsel presented no grounds for concluding that Benitiz's testimony could be obtained in a timely manner. Under these circumstances, the court did not abuse its discretion in denying the continuance. (*Rodriguez v. Oto* (2013) 212 Cal.App.4th 1020, 1037-1040 [trial court properly denied continuance first requested at hearing on summary judgment motion and unsupported by declarations]; *Ambrose v. Michelin North America, Inc.* (2005) 134 Cal.App.4th 1350, 1353 [same]; *American Continental Ins. Co. v. C & Z Timber Co.* (1987) 195 Cal.App.3d 1271, 1280 [trial court properly denied continuance requested in opposition memorandum to summary judgment, as no declarations were submitted establishing basis for continuance].)

Appellant also contends that the trial court was obliged to grant a continuance under Code of Civil Procedure section 473, which Mandell identified as an alternative basis for his oral request during the hearing on the summary judgment motions.[14] However, the provisions for mandatory relief under that statute are inapplicable to a grant of summary judgment. (*Prieto v. Loyola Marymount University* (2005) 132 Cal.App.4th 290, 294-297; *English v. IKON Business Solutions, Inc.* (2001) 94 Cal.App.4th 130, 148-149.) Furthermore, to the extent appellant relies on the provisions for discretionary relief, she failed to establish a basis for relief. Under subdivision (b) of Code of Civil Procedure

---

[14] Under the discretionary provisions of Code of Civil Procedure section 473, subdivision (b), "[t]he court may, upon any terms as may be just, relieve a party . . . from a judgment, dismissal, order, or other proceeding taken against him or her through his or her mistake, inadvertence, surprise, or excusable neglect," provided that application for relief is "made within a reasonable time, in no case exceeding six months, after the judgment, dismissal, order, or proceeding was taken." Furthermore, under the separate mandatory provisions of subdivision (b), the court must vacate a "default judgment or dismissal" resulting from an attorney's "mistake, inadvertence, surprise, or neglect" in defined circumstances.

28

section 473, the moving party "must show, by affidavit or other proof, a reasonable excuse" for the party's untimely request to obtain and present additional evidence. (8 Witkin, Cal. Procedure (5th ed. 2008) Attack on Judgment in Trial Court, §§ 144, 179, pp. 736, 779.)  Because appellant made no such showing in requesting a continuance, the statute does not afford her relief.  In sum, the trial court did not err in denying a continuance.

## DISPOSITION

The judgment is affirmed.  Respondents are awarded their costs on appeal.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


MANELLA, J.

We concur:



WILLHITE, Acting P. J.



SUZUKAWA, J.