Filed 11/2/21  Franco v. Security Industry Specialists CA2/3

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(a). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115(a).

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| DIANE FRANCO et al., | B304976 |
| Plaintiffs and Appellants, | Los Angeles County |
| v. | Super. Ct. No. BC635188 |
| SECURITY INDUSTRY SPECIALISTS, INC., et al., | |
| Defendants and Respondents. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Robert B. Broadbelt, Judge. Reversed and remanded.

Nelson & Fraenkel, Stuart R. Fraenkel, Gabriel S. Barenfeld, Gabriel Beugelmans; Law Offices of Savin & Bursk and Adam J. Savin for Plaintiffs and Appellants.

Wesierski & Zurek, Ronald Zurek and Lynne Rasmussen for Defendants and Respondents.

# INTRODUCTION

Anthony R. Pineda and Diane Franco (Parents) sued, among others, Star World Plaza (Plaza), the Plaza's owners George Younan and Ratiba Younan, and Wayne Ng,[1] the Plaza's property manager, for negligence, premises liability, and wrongful death, after the Parents' son, Anthony V. Pineda (Anthony), was killed during an armed robbery while he was working as a security guard and receptionist at an unlicensed marijuana dispensary in the Plaza. The Landlords moved for summary judgment, claiming they owed no duty of care to Anthony because the armed robbery was not foreseeable and, in any event, the Parents could not prove the lack of additional security measures contributed to Anthony's death. The court granted summary judgment in the Landlords' favor, and the Parents appealed.

Under the circumstances of this case, we conclude the Landlords owed Anthony a duty to provide minimally burdensome security measures—a reinforced security door and commercial grade lock—inside the dispensary. We also conclude there is a triable issue of fact concerning whether the Landlords' failure to provide these security measures contributed to Anthony's death. We therefore reverse the judgment.

---

[1] We collectively refer to the Plaza, the Younans, and Ng as the "Landlords."

## FACTS AND PROCEDURAL BACKGROUND

**1.    The Property**

George and Ratiba Younan own the Plaza, a commercial strip mall in the City of San Bernardino. Ng is the Plaza's property manager. Ng handles all of the property's day-to-day management, including negotiating and executing lease agreements with new tenants, collecting rent payments from existing tenants, and hiring security services to monitor the property.

In November 2014, the Landlords agreed to lease one of the Plaza's units to Ernesto Atanacio III to operate the "House of OG," a medical marijuana dispensary. According to the lease agreement, the unit was to "be used exclusively as a Medical Marijuana Dispensary in compliance with state regulations." When the lease agreement was executed, and through the events leading to this lawsuit, it was illegal to operate marijuana dispensaries in San Bernardino.[2]

Atanacio agreed to pay $4,000 per month for the first three months of rent, with the amount of rent increasing to $5,000 per

---

[2] Specifically, San Bernardino Municipal Code Chapter 5.05.010 made it "unlawful for any person or entity to establish, own, manage, conduct, or operate any medical marijuana dispensary … or to participate as an employee, contractor, agent, volunteer, or in any other manner or capacity, in any medical marijuana dispensary in the City of San Bernardino." Ordinance No. MC-1349, which enacted Chapter 5.05.010 of the San Bernardino Municipal Code, states that the City banned medical marijuana facilities because other cities that had permitted such businesses experienced significant increases in violent crime, including burglaries, robberies of customers leaving dispensaries, and takeover robberies of dispensaries.

month for the remainder of the lease. When he signed the lease agreement, Atanacio paid the Landlords $18,000, consisting of a $10,000 non-refundable security deposit and the first two months of rent. The amount of rent the Landlords charged Atanacio was significantly higher per square foot than what they charged other tenants in the Plaza.[3]

## 2. Prior Incidents of Violence at the Plaza

Before the House of OG opened, the Landlords leased retail space in the Plaza to another medical marijuana dispensary. Although there were no reported incidents of violence involving the other dispensary, there were at least seven reported robberies and thefts on the Plaza's property between 2012 and 2014. And, about four months before the House of OG opened, a person was killed in a gang-related shooting in the Plaza's parking lot. A few months later (but before leasing property to the House of OG), Ng hired a security company to patrol the Plaza's parking area at night.

## 3. The Shooting at the Dispensary

One evening in February 2015, Anthony was working as an armed security guard and receptionist at the House of OG. Anthony was the only security guard on duty. He was working in

---

[3] For example, a nutritional store that occupied the same amount of square footage as the unit occupied by the House of OG—1,200 square feet—paid only $755 per month in rent. And a market that occupied a unit that was 10,000 square feet and a Chinese food restaurant that occupied a unit that was 2,100 square feet paid, respectively, $4,744 per month and $1,381 per month in rent. In other words, most of the Plaza's other tenants paid less than $1 per square foot, while the House of OG paid between $3.33 and $4.17 per square foot.

the store's product room, which was separated from the front lobby by a sliding glass window and a "thin paneled unreinforced" door that was connected to an "electronic locking mechanism."

Shortly before the House of OG was supposed to close that night, two men armed with guns entered the dispensary's lobby. They opened the interior door separating the lobby from the product room and shot and killed Anthony as he tried to prevent them from accessing the product room. The lock on the interior door wasn't working when Anthony was killed.

### 4.    The Lawsuit

The Parents filed a lawsuit against, among others, Star World Plaza, the Younans (in their individual capacities and as co-trustees of the Younan Family Trust), and Ng, asserting claims for negligence, wrongful death, and premises liability, all arising out of Anthony's death during the February 2015 shooting at the House of OG. The Parents claimed the Landlords were responsible for Anthony's death because they leased retail space to an illegal marijuana dispensary, they knew the Plaza attracted violent criminal conduct, and they failed to provide adequate security measures to protect tenants and invitees, like Anthony, from such conduct.

The Landlords[4] filed separate summary judgment motions. In support of their motions, the Landlords submitted the Parents' responses to special interrogatories and requests for admissions. Ng and George Younan submitted declarations in which they

---

[4] The Younans and the Plaza jointly filed one motion and Ng filed his own motion. Because they filed a joint respondents' brief and don't present any arguments differentiating their legal positions on appeal, we discuss the Landlords' arguments collectively.

testified that they were unaware of any violent crime that had occurred on the Plaza's property before Anthony was killed at the House of OG.

The Landlords argued they didn't owe Anthony a duty to protect him from third-party criminal conduct because they were unaware of any prior criminal conduct at the Plaza, rendering the shooting at the dispensary unforeseeable. As for causation, the Landlords claimed the Parents couldn't present any non-speculative evidence to support a finding that additional security measures would have prevented the shooting that killed Anthony.

The Parents opposed both motions. They contended the February 2015 shooting at the House of OG was foreseeable because a marijuana dispensary was an obvious target for robberies and several violent crimes on the Plaza's property had been reported in the three years before the dispensary opened. The Parents claimed the Landlords could have prevented Anthony's death by refusing to lease premises in the Plaza to an illegal marijuana dispensary or, in the alternative, by enacting more effective security measures at the dispensary, including: (1) hiring a second armed guard to protect the outside of the dispensary and the dispensary's lobby; (2) ensuring the dispensary was equipped with a working video surveillance system that covered the exterior and interior of the dispensary's unit; (3) installing a steel security door equipped with a commercial grade keypad lock with a deadbolt and reinforcer separating the product room from the lobby; and (4) installing bullet proof glass between the lobby and the receptionist. The Parents also argued there were triable issues of fact as to whether the Landlords contributed to Anthony's death by leasing

retail space to an illegal and inherently dangerous business and by failing to provide more effective security measures on the House of OG's premises.

In support of their oppositions, the Parents submitted, among other things, police reports and photographs from the investigation of the shooting at the House of OG, excerpts of transcripts from the criminal trial of the defendants suspected of shooting Anthony, and excerpts of the transcripts from Ng's and George Younan's depositions.[5] In one of the police reports, the investigating officer observed that the lock on the unreinforced door separating the House of OG's lobby from the product room had malfunctioned and the store's interior and exterior security cameras weren't recording any footage at the time of the shooting. And two of the employees who were working at the dispensary at the time of the shooting testified that the suspects were able to force open the door between the lobby and the product room before they shot Anthony.

The Parents also submitted declarations from Rudy Petersen, a police officer and security specialist, addressing the industry standards for security measures at marijuana dispensaries. According to Petersen, it would have cost: (1) about $55 per hour to hire a second armed guard; (2) about $100 per month to operate working video surveillance equipment; (3) about $1,000 to install a bullet resistant steel security door with a commercial grade keypad lock; and (4) between $50 to $150 per square foot for a bullet proof window.[6]

---

[5] The Landlords didn't object to any of this evidence.

[6] The court overruled objections to Peterson's testimony regarding the industry standard for security of marijuana dispensaries and his

The court granted the Landlords' summary judgment motions. The court found the Landlords didn't owe Anthony a duty to protect him from third-party criminal conduct. Specifically, the court found the shooting in this case was not sufficiently foreseeable to require the Landlords to provide any of the Parents' proposed security measures because there had been no similar incidents of violence involving a marijuana dispensary on the Plaza's property in the past. The court also rejected the Parents' claim that the Landlords' conduct was negligent per se because they knowingly leased retail space to a marijuana dispensary in violation of local ordinances outlawing such businesses. As for causation, the court found the Parents failed to establish a triable issue of fact that the Landlords' failure to provide additional security measures at the House of OG contributed to Anthony's death.

The court entered judgment in the Landlords' favor. The Parents appeal, challenging both orders granting summary judgment.

## DISCUSSION

### 1. Principles of Summary Judgment and Standard of Review

A court may grant summary judgment where no triable issues of material fact exist and the moving party is entitled to judgment as a matter of law. (*Merrill v. Navegar, Inc.* (2001) 26

---

opinion that such measures were necessary to protect persons who were lawfully within the dispensaries. The court, however, sustained objections to Peterson's testimony that the lack of an adequate interior security door and additional security guard contributed to Anthony's death.

Cal.4th 465, 476 (*Merrill*).) Defendants who move for summary judgment must show that one or more elements of the plaintiffs' claim cannot be established or that there exists a complete defense to the claim. (Code Civ. Proc., § 437c, subd. (p)(2).) If the defendants make a sufficient showing, the burden shifts to the plaintiffs to present evidence establishing a triable issue of material fact. (*Ibid.*) A triable issue of fact exists if the evidence would allow a reasonable trier of fact to find in favor of the party opposing summary judgment. (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850 (*Aguilar*).)

We independently review a trial court's ruling on a motion for summary judgment. (*Aguilar*, *supra*, 25 Cal.4th at p. 860.) We liberally construe the evidence in favor of the opposing party and resolve all doubts about the evidence in that party's favor. (*Wiener v. Southcoast Childcare Centers, Inc.* (2004) 32 Cal.4th 1138, 1142.) We consider all evidence the parties submit in connection with the motion, except that which the court properly excluded. (*Merrill*, *supra*, 26 Cal.4th at p. 476.)

## 2.    Evidentiary Rulings

As a preliminary matter, we address the Parents' challenges to some of the court's evidentiary rulings. As we explain, none of these challenges are adequately developed in the Parents' opening brief.[7]

---

[7] To the extent the Parents present additional arguments in their reply brief challenging the court's evidentiary rulings, those arguments are not properly before us. (*REO Broadcasting Consultants v. Martin* (1999) 69 Cal.App.4th 489, 500 [appellate courts won't consider issues raised for the first time in a reply brief because it deprives opposing counsel of the opportunity to respond].)

In a footnote in their opening brief, the Parents claim the court "erroneously denied" their request for judicial notice of a so-called "White Paper," a document drafted by an association of the State's police chiefs outlining the potential risks marijuana dispensaries pose to their surrounding communities and citing specific examples of violence targeting marijuana dispensaries and people who possess marijuana. The San Bernardino City Council relied on the "White Paper" when it enacted Chapter 5.05 of the San Bernardino Municipal Code.

The Parents don't develop this point at all, making only a conclusory assertion that the court erred when it denied their request for judicial notice. It is well-settled that a ruling of the lower court is presumed correct, and it is incumbent on the party challenging that ruling to affirmatively demonstrate why it was erroneous through, among other things, reasoned legal analysis. Because the Parents offer no legal argument to support their claim that the court erred in excluding the "White Paper," they have waived that claim on appeal. (*Dix v. Live Nation Entertainment, Inc.* (2020) 56 Cal.App.5th 590, 616 [" '[i]f a party's briefs do not provide legal argument and citation to authority on each point raised, " 'the court may treat it as waived, and pass it without consideration.' " ' "].)

Likewise, the Parents have waived their challenges to the court's rulings excluding portions of two of their experts' testimony. "It is [the] appellant's 'burden to affirmatively challenge the trial court's evidentiary ruling[s], and demonstrate the court's error.' [Citation.]" (*Salas v. Department of Transportation* (2011) 198 Cal.App.4th 1058, 1074 (*Salas*).) If a party contends that an evidentiary objection was improperly sustained by the trial court, "the party must identify the specific

10

objection, provide legal argument explaining why the trial court's ruling was in error, and support that argument with citation to pertinent legal authority." (*City of Crescent City v. Reddy* (2017) 9 Cal.App.5th 458, 463.)

Here, the Parents point to portions of their experts' testimony that they claim the court should have admitted. They do not, however, "specif[y] the [underlying] evidentiary objections" giving rise to the challenged rulings, identify any of the multiple grounds on which those objections were made, or attempt to explain why those grounds do not support excluding the experts' testimony. "In arguing only generalities, plaintiffs' briefs do not contain 'argument and citations to authority as to why the trial court's evidentiary rulings were wrong.' [Citation.]" (*Salas*, *supra*, 198 Cal.App.4th at p. 1074.) Plaintiffs have therefore forfeited their challenges to the court's rulings excluding portions of the expert witnesses' testimony. (*Ibid.*) In any event, any error in excluding portions of the experts' testimony was harmless for the reasons we discuss in the causation analysis below.

3.      **Legal Principles Concerning a Landlord's Duty to Protect Against Third-Party Criminal Conduct**

When asserting claims for wrongful death, premises liability, and negligence arising out of the defendants' alleged negligent maintenance of their property, the plaintiff must show the defendants owed the decedent a legal duty and that the defendants' breach of that duty was a cause of the decedent's death. (*Ann M. v. Pacific Plaza Shopping Center* (1993) 6 Cal.4th 666, 678 (*Ann M.*), disapproved on another ground in *Reid v. Google, Inc.* (2010) 50 Cal.4th 512, 527, fn. 5 (*Reid*); see also *Williams v. Fremont Corners, Inc.* (2019) 37 Cal.App.5th 654, 662

11

[same analysis applies to a claim for premises liability based on a theory of negligence]; *Jacoves v. United Merchandising Corp.* (1992) 9 Cal.App.4th 88, 105 [a complaint asserting claim for wrongful death based on a theory of negligence must contain allegations as to all the elements of negligence].)

The first issue we must decide is whether the Landlords owed Anthony a duty to protect him from the third-party criminal conduct that resulted in his death—i.e., the armed robbery at the House of OG.[8] Whether a duty exists is a question of law to be decided by the court. (*Brown v. USA Taekwondo* (2021) 11 Cal.5th 204, 213 (*Brown*).)

Landlords generally owe a duty to their tenants and invitees to maintain their property in a reasonably safe condition, including taking "reasonable measures to secure areas under the landlord[s'] control against foreseeable criminal acts of third parties." (*Castaneda v. Olsher* (2007) 41 Cal.4th 1205, 1213 (*Castaneda*); see also Civ. Code, § 1714, subd. (a) ["[e]veryone is responsible … for an injury occasioned to another by his or her want of ordinary care or skill in the management of his or her property … ."].) Landlords also owe a duty to "exercise reasonable care to discover that criminal acts are being or are likely to be committed on its land … ." (*Ann M., supra*, 6 Cal.4th at p. 679.) Unless created by statute, an exception to a duty requirement should only be applied if it is " ' "clearly supported by public

---

[8] On appeal, Ng doesn't dispute that the scope of any duty he may owe to the Plaza's tenants and invitees would be the same as the duty owed by the Plaza's owners. (See *Frances T. v. Village Green Owners Assn.* (1986) 42 Cal.3d 490, 499–503 [acknowledging that property managers owe a duty to protect tenants and invitees against foreseeable criminal acts].)

12

policy." ' [Citation.]" (*Kesner v. Superior Court* (2016) 1 Cal.5th 1132, 1143 (*Kesner*); see also *Rowland v. Christian* (1968) 69 Cal.2d 108, 112.)

Whether a landlord should be excepted from the duty to protect their tenants and invitees from criminal conduct of others is typically analyzed under a four-step process. (*Castaneda*, *supra*, 41 Cal.4th at p. 1214; see also *Brown, supra*, 11 Cal.5th at pp. 217–218 [*Rowland* factors determine whether to recognize an exception to the general duty of care, not whether to establish the existence of a duty in the first instance].) First, we must determine the specific measures the plaintiffs claim the defendants should have taken to prevent the underlying injury. (*Castaneda*, at p. 1214.) Second, we must evaluate how financially and socially burdensome it would be to impose the plaintiffs' proposed measures. (*Ibid.*) Third, we must " 'identify the nature' " of the third-party criminal conduct that the plaintiffs claim could have been prevented had the defendants taken the proposed measures and assess how foreseeable it was that the criminal conduct would occur. (*Ibid.*) Fourth, we compare the burden of enacting the proposed security measures against the foreseeability of the third-party conduct. (*Ibid.*)

Generally, the higher the burden to be imposed on a landlord, the higher the degree of foreseeability is required. (*Tan v. Arnel Management Co.* (2009) 170 Cal.App.4th 1087, 1096 (*Tan*).) " ' " 'On the other hand, in cases where there are strong policy reasons for preventing the harm, or the harm can be prevented by simple means, a lesser degree of foreseeability may be required.' [Citation.]" ' [Citation.]" (*Castaneda*, *supra*, 41 Cal.4th at pp. 1213–1214.) For instance, our Supreme Court has held that a "high degree of foreseeability is required in order to

13

find that the scope of a landlord's duty of care includes the hiring of security guards" because the "monetary costs of security guards is not insignificant" and "the obligation … is not well defined." (*Ann M., supra,* 6 Cal.4th at p. 679.) Likewise, a duty to refuse to rent to, or a duty to evict, a potentially dangerous tenant requires circumstances that would have made the plaintiff's injury highly foreseeable. (*Castaneda*, at pp. 1219–1221.) But where the proposed security measures are minimally burdensome, such as requiring the one-time installation of unmanned security barriers, only "regular" foreseeability of the risk of harm is necessary. (*Tan*, at pp. 1100–1101 [installation of four security gates to protect apartment complex was minimally burdensome and required regular foreseeability of risk of harm]; see also *Delgado v. Trax Bar & Grill* (2005) 36 Cal.4th 224, 243, fn. 24 (*Delgado*) [in cases where harm can be prevented by simple means or by imposing "merely minimal burdens," only regular foreseeability is required].)

### 3.1. The Landlords owed a duty to ensure the premises were equipped with a reinforced interior security door and commercial grade lock.

We first address whether the court properly found the Landlords owed Anthony no duty to enact specific security measures on the premises that they leased to the House of OG. The Parents claim the Landlords should have provided the following security measures to protect Anthony: (1) a second armed security guard stationed near the entrance of the dispensary; (2) a working video surveillance system that covered the exterior and interior of the dispensary's unit; (3) a steel security door with a commercial grade deadbolt lock to separate

14

the dispensary's product room from the lobby; and (4) a bulletproof glass receptionist's window between the dispensary's lobby and the product room. As we explain, the court erred in finding the Landlords didn't owe a duty to Anthony to install a reinforced interior security door with a commercial grade lock on the premises that they leased to the House of OG.[9]

When evaluating the burden of implementing a plaintiff's proposed security measures, courts may look to "various case-specific factors," including the characteristics of the property in question. (*Vasquez v. Residential Investments, Inc.* (2004) 118 Cal.App.4th 269, 285 (*Vasquez*), citing *Pamela W. v. Millsom* (1994) 25 Cal.App.4th 950, 958 [what may be a large burden for the owner of small residential or commercial property may be a minimal burden for the owner of a large apartment building or a shopping center].) Here, the financial and social cost of installing a reinforced interior security door with a functioning commercial grade lock to separate the dispensary's customer lobby from the product room would have been minimal.

Rudy Petersen, the Parents' expert on security standards for marijuana dispensaries, testified that it would have cost the Landlords about $1,000 to install a reinforced steel security door with a commercial grade lock inside the unit they leased to Atanacio to operate the House of OG. That would have been a one-time expenditure that didn't necessitate the hiring of additional personnel to monitor or otherwise guard the premises.

---

[9] We don't address whether the Landlords owed a duty to provide the other proposed security measures because, as we explain below, the court properly found the Parents could not prove such conduct or omissions on the Landlords' part contributed to Anthony's death.

(See *Tan, supra,* 170 Cal.App.4th at p. 1096 [requirement that landlord and manager of apartment complex install four security gates with a one-time cost of about $26,000 and no need to hire additional security personnel to secure the property against third-party crime was minimally burdensome].)

And, in light of the amount of rent the Landlords charged Atanacio to lease the House of OG's premises, the cost of installing the security door and lock would have been negligible. As we explained above, the Landlords charged Atanacio between $4,000 and $5,000 per month to rent the 1,200 square-foot unit where the House of OG operated. That amount of rent on a square-foot basis was much higher than the amount of rent the Landlords charged the Plaza's other tenants at the time. Indeed, even after accounting for a one-time $1,000 payment, the Landlords still would have made more per month on a square-foot basis from the dispensary's rent than they made from any of the other units on the Plaza's premises. This factor clearly weighs in favor of finding the Landlords owed a duty to install a reinforced security door and lock inside the House of OG's premises.

Next, we must evaluate the foreseeability of the robbery and shooting at the House of OG and balance that foreseeability against the burden of installing a reinforced interior security door with a commercial grade lock. (See *Castaneda, supra,* 41 Cal.4th at p. 1214.) In its summary judgment ruling, the court applied a heightened foreseeability standard to evaluate whether the Landlords could have anticipated the robbery and shooting inside the House of OG for purposes of enacting *any* of the Parents' proposed security measures. For example, the court found the Parents' evidence of the July 2014 shooting in the Plaza's parking

16

lot and the other robberies and assaults on the Plaza's premises in the three years before the Landlords leased a unit to the dispensary was not sufficiently similar to put the Landlords on notice of the type of crime that caused Anthony's death. Specifically, the court focused on the fact George Younan and Ng each testified they had no actual knowledge of those prior incidents and that none of the incidents occurred *inside* the House of OG's premises or involved another marijuana dispensary at the Plaza.

The court's heightened foreseeability analysis was flawed as it applied to the proposed security measures of installing a reinforced interior security door and commercial grade keypad lock. As we explained above, where the plaintiffs' proposed security measures are minimally burdensome, a "lesser degree of foreseeability"—i.e., only "regular" foreseeability—of third-party criminal conduct is required. (*Delgado*, *supra*, 36 Cal.4th at p. 243, fn. 24.) Applying that standard here, the armed robbery of the House of OG was sufficiently foreseeable to trigger the Landlords' duty to install the security door and lock inside the dispensary's premises.

The Parents presented evidence that there had been at least several reported robberies or assaultive crimes and one fatal shooting on the Plaza's premises before the Landlords leased retail space to the House of OG. These crimes, while not involving a marijuana dispensary or the same unit where the House of OG later operated, were similar to the type of crime that caused Anthony's death—i.e., a robbery and fatal shooting. (See *Tan*, *supra*, 170 Cal.App.4th at p. 1100 [under a lowered standard of foreseeability, existence of prior assaultive crimes on defendant's property, even though they weren't committed in a similar

17

manner, were sufficiently similar to make the assault on the plaintiff foreseeable].)

That George Younan and Ng each testified they were unaware of the prior incidents of violence that occurred on the Plaza's premises is not dispositive. Actual knowledge of incidents involving the same type of conduct as the underlying crime that caused the plaintiff's injury is not required to meet the lower standard of foreseeability applicable to the implementation of minimally burdensome security measures. (See *Vasquez*, *supra*, 118 Cal.App.4th at p. 286.) That is, it may be sufficient that the owners had reason to know that their lack of adequate security measures created a risk of third-party criminal conduct. (*Ibid.*; see also *Musgrove v. Ambrose Properties* (1978) 87 Cal.App.3d 44, 52 [for purposes of foreseeability, a landowner may have reason to know of risk of third party crime based on location or character of business].)

As we noted above, landlords owe a duty to exercise reasonable care to discover whether criminal acts are being, or are likely to be, committed on their land. (*Ann M.*, *supra*, 6 Cal.4th at p. 679.) In light of this duty, the Landlords certainly had reason to know of the relatively extensive history of violent crimes that occurred at the Plaza in the three years before they leased retail space to the House of OG. Indeed, a reasonable inference can be drawn that, at the very least, Ng was aware of the prior fatal shooting on the Plaza's premises based on the fact that he hired a private security company to patrol the Plaza at night only a few months after that shooting occurred and shortly before leasing space to the House of OG.

In addition, based on other evidence, it was reasonable to infer the Landlords knew of, and were compensated for, the risk

18

of leasing retail space to an unlicensed marijuana dispensary. The Landlords received above-market rent that was paid in cash, and they received a non-refundable security deposit. They also failed to verify the identity of the House of OG's operators or to determine whether they had a business license. (*Donchin v. Guerrero* (1995) 34 Cal.App.4th 1832, 1839 [landlord's actual knowledge can be inferred from circumstantial evidence].)

Viewing the evidence in a light most favorable to the Parents, as we must when reviewing an order granting summary judgment, the prior fatal shooting and numerous robberies and other assaultive crimes on the Plaza's premises rendered an armed robbery inside one of the businesses at the Plaza sufficiently foreseeable to trigger the Landlords' duty to enact minimally burdensome security measures. (See *Tan*, *supra*, 170 Cal.App.4th at p. 1101.)

The fact that the Landlords didn't possess or control the dispensary's premises *at the time of the shooting* doesn't relieve them of a duty of care. The Parents presented evidence that, when the Landlords decided to lease the premises to Atanacio, they were aware that he intended to operate a medical marijuana dispensary. Indeed, the lease agreement states that the unit the Landlords leased to Atanacio shall only be used for such purposes. Thus, there is evidence that the Landlords were aware of the nature of the business Atanacio intended to operate on the Plaza's premises when they still had possession and control of the premises where the shooting occurred. The Landlords, therefore, had the opportunity to enter the premises that they decided to lease to the House of OG and install adequate security measures before transferring control and possession of the property to

19

Atanacio.[10] (See *Salinas v. Martin* (2008) 166 Cal.App.4th 404, 414 [landlord will not be excepted from duty of care when he was able to implement safety measures to prevent the plaintiff's injury before relinquishing possession and control of the property to a tenant].)

In short, the court erred in finding the Landlords owed Anthony no duty of care to ensure the dispensary's premises were equipped with a reinforced interior security door and a commercial grade lock.

### 3.2. The Landlords did not owe a duty to refuse to lease to, or a duty to evict, the dispensary.

The Parents also contend the Landlords owed a duty to refuse to rent to the House of OG because it was illegal to operate a marijuana dispensary in San Bernardino at the time of the armed robbery and such businesses are inherently dangerous. In contrast to a duty to impose minimally burdensome security measures, the duty not to rent property to a specific tenant or to later evict a potentially dangerous tenant requires a high degree of foreseeability. (See *Castaneda*, *supra*, 41 Cal.4th at pp. 1219–1220.) Generally, that requires the plaintiff to present evidence that the landlords were aware that crimes similar to the one that

---

[10] Although the court didn't address the issue of breach, there is a triable issue of fact as to whether the Landlords breached their duty to Anthony to install a reinforced interior security door with a commercial grade lock for a similar reason—i.e., despite having knowledge of the type of business Atanacio intended to operate on their property when they still had possession and control of it, they failed to take reasonable steps to prevent a foreseeable type of harm. (*Kesner*, *supra*, 1 Cal.5th at p. 1144 [unlike duty, breach is a question of fact for the jury to decide].)

caused the plaintiff's injury had targeted the business at issue to render the plaintiff's attack foreseeable. (See *Sharon P. v. Arman, Ltd.* (1999) 21 Cal.4th 1181, 1195 (*Sharon P.*) [seven armed robberies targeting bank that served parking garage where plaintiff was later sexually assaulted did not render the sexual assault sufficiently foreseeable to impose heightened security measures].) That level of foreseeability was not present here.

While the Parents submitted evidence of other violent crimes occurring on the Plaza's premises before the armed robbery that led to Anthony's death, it is undisputed that none of those prior incidents involved the House of OG or any of the other marijuana dispensaries that the Landlords had leased property to in the past. Thus, the prior acts of violence on the Plaza's premises were not sufficiently similar to the armed robbery in this case to trigger a duty to refuse to rent to, or to evict, the House of OG.

Nor did the Parents establish that a medical marijuana dispensary is such an "inherently dangerous" enterprise that the presence of such a business always makes it foreseeable that armed robberies are likely to occur. The designation of an " 'inherently dangerous property' " is rare and "reserved for properties that 'regardless of their individual physical characteristics and locations' are by their nature, prone to violence." (*Lopez v. Baca* (2002) 98 Cal.App.4th 1008, 1017 (*Lopez*).) Although the Parents presented evidence that local municipalities, including the City of San Bernardino, had banned medical marijuana dispensaries because other municipalities had experienced an increase in violent crime that may be attributable to the operation of such businesses, the Parents presented no

21

evidence that *all* marijuana dispensaries are dangerous enterprises and prone to violent criminal attacks.[11] (*Ibid.* [plaintiff failed to present evidence that *all* bars or nightclubs, even those operating in violation of the law, are "by their nature prone to violent criminal attacks and are thus inherently dangerous"].)

In short, the Parents didn't establish that the Landlords also owed a duty to refuse to rent to, or a duty to evict, the House of OG.[12]

---

[11] Even if we were to assume that the court should have granted the Parents' request for judicial notice of the "White Paper," that document could only establish that marijuana dispensaries are sometimes dangerous. It does not establish as a matter of law that *all* marijuana dispensaries are inherently dangerous.

[12] In their oppositions to the motions for summary judgment and on appeal, the Parents contend the court should have presumed the Landlords' duty and breach under a theory of negligence per se because the Landlords leased property to a type of business that was prohibited from operating in San Bernardino. This argument lacks merit. A plaintiff must assert a claim for negligence per se based on a violation of a statute or ordinance in the operative complaint or he or she must later move to amend the operative complaint to assert such a claim. (*Lopez, supra*, 98 Cal.App.4th at p. 1019.) If the plaintiff fails to do so, he or she "is precluded from relying on that theory as a basis for seeking denial of summary judgment." (*Ibid.*) Here, the Parents never asserted a claim for negligence per se in their operative first amended complaint, nor did they seek leave to amend that complaint to assert such a claim. They therefore cannot claim the court erred in granting summary judgment because the elements of duty and breach were established under this theory.

## 4. There is a triable issue of fact as to whether the Landlords' conduct contributed to Anthony's death.

The Parents also contend the court erred in finding, as a matter of law, that the Landlords' failure to provide more effective security measures at the House of OG was not a cause Anthony's death. As we explain, there is a triable issue as to whether the lack of a reinforced security door with a functioning lock separating the dispensary's lobby from the product room contributed to Anthony's death. As for the other security measures proposed by the Parents, the court properly found there was no triable issue as to whether the lack of such measures was a contributing factor in Anthony's death.

After establishing a defendant breached a legal duty, the plaintiff must prove that breach was a cause of the plaintiff's injury. (*Saelzer v. Advanced Group 400* (2001) 25 Cal.4th 763, 772 (*Saelzer*).) To do so, the plaintiff needs to establish that the defendant's negligence was a "substantial factor" in causing the injury. (*Ibid.*; see also *Sandoval v. Bank of America* (2002) 94 Cal.App.4th 1378, 1385.) To be a "substantial factor," the defendant's negligence need only have "contributed in some way to the plaintiff's injury." (*Sandoval*, at p. 1384.) In other words, the element of causation is satisfied if " 'but for' the defendant's negligence the injury would not have been sustained." (*Ibid.*)

As the California Supreme Court has explained, a plaintiff must present "nonspeculative evidence" of a causal link between the third-party conduct that injured the plaintiff and the landlord's "failure to provide adequate security measures." (*Saelzer*, *supra*, 25 Cal.4th at p. 774.) That means the plaintiff must be able "to prove it was 'more probable than not' that additional security precautions would have prevented the

23

attack." (*Id.* at p. 776.) Generally, it is not enough to defeat summary judgment by "simply criticiz[ing], through the speculative testimony of supposed security 'experts,' the extent and worth of the defendant's security measures … ." (*Id.* at p. 774.) Instead, the plaintiff "must show the injury was actually caused by the failure to provide greater security measures." (*Ibid.*)

As a preliminary matter, the Landlords met their initial burden on summary judgment to negate the element of causation by "point[ing] to the absence of evidence to support" the Parents' claim that their omissions were a cause of Anthony's death. (*Saelzer*, *supra*, 25 Cal.4th at pp. 780–781.) The burden, therefore, shifted to the Parents to produce evidence that would establish a triable issue as to causation.

Here, the Parents presented evidence that would support a finding that the Landlords' failure to install an adequate security door with a functioning lock between the dispensary's lobby and its product room was a substantial factor in causing Anthony's death. As we discussed above, the Parents submitted a police report from the investigation of the shooting at the dispensary. The officer who drafted the report noted that the lock on the security door between the lobby and the product room wasn't working at the time of the shooting. Specifically, the officer noted that even though the doorknob appeared to be in a locked position, a person in the lobby could still push the door open to access the product room where Anthony was working when he was shot. In addition, two of the employees who were working at the House of OG at the time of the shooting testified that although customers weren't supposed to be able to access the product room from the lobby without being "buzzed in" through a

remote locking mechanism, the intruders were able to force the door open and enter the product room immediately before shooting Anthony. This evidence supports an inference that but for the Landlords' failure to install a reinforced security door with a commercial grade lock, the intruders wouldn't have been able to access the product room where they shot Anthony.

Indeed, this case presents a similar situation to the hypothetical our Supreme Court posed in *Saelzer* to illustrate when a causal link between a landlord's failure to take adequate steps to secure premises against foreseeable third-party crime and a plaintiff's injuries can be established with sufficient certainty to support a claim for negligence. There, the court explained that a plaintiff could establish the necessary causal link by showing "the assailant took advantage of the defendant's lapse (such as a failure to keep a security gate in repair) in the course of committing his attack, and that the omission was a substantial factor in causing injury." (*Saelzer*, *supra*, 25 Cal.4th at p. 779; see also *ibid.* [" 'When an injury can be prevented by a lock or a fence or a chain across a driveway or some other physical device, a landowner's failure to erect an appropriate barrier can be the legal cause of an injury inflicted by the negligent or criminal act of a third person.' "].) The Parents' evidence supports a finding that such a scenario existed in this case—i.e., that the Landlords' failure to provide an adequate barrier securing the area of the dispensary where Anthony was working from the public's entrance to the store contributed to Anthony's death.

The Parents failed, however, to create a triable issue as to whether the Landlords' failure to provide the other proposed security measures—i.e., an additional security guard, working

interior and exterior security cameras, and a bulletproof receptionist's window between the dispensary's lobby and product room—were a substantial factor in causing Anthony's death. That is, the Parents didn't present any "nonspeculative evidence" that could establish a causal link between the absence of such security measures and the fatal shooting in this case. (See *Saelzer*, *supra*, 25 Cal.4th at p. 776.)

Even if we were to assume the court should have admitted Petersen's testimony addressing the issue of causation, that testimony was nothing more than speculation as it related to the other proposed security measures. That is, while Petersen explained how the lack of a reinforced interior security door contributed to Anthony's death,[13] he claimed only that the other measures were "necessary." Petersen didn't point to any evidence to support that conclusion, nor did he attempt to explain in any detail how those other measures could have prevented Anthony's death. (*Saelzer*, *supra*, 25 Cal.4th at pp. 775–776 [" 'A mere possibility of … causation is not enough; and when the matter remains one of pure speculation or conjecture, or the probabilities are at best evenly balanced, *it becomes the duty of the court to direct a verdict for the defendant.*' "]; see also *Sharon P.*, *supra*, 21 Cal.4th at pp. 1195–1196 [it is difficult to predict how an increased presence of security guards, the installation of working security cameras, or improved lighting would deter a specific assault], disapproved on another ground in *Reid*, *supra*, 50

---

[13] The court excluded this testimony as speculative and lacking a proper foundation. We need not decide whether that ruling was correct because other evidence, which we discussed above, independently created a triable issue of fact as to the issue of causation concerning the lack of an adequate interior security door and lock.

Cal.4th at p. 527, fn. 5.) Because the Parents offered no evidence independent of Petersen's testimony that would support a finding of a causal link between the shooting that caused Anthony's death and the Landlords' failure to provide an additional security guard, a bulletproof receptionist's window, or working interior and exterior security cameras, the court properly found there was no triable issue on causation as to those measures.

## DISPOSITION

The judgment is reversed and the matter is remanded for further proceedings consistent with the views expressed in this opinion. The Parents shall recover their costs on appeal.

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

LAVIN, Acting P. J.

WE CONCUR:

EGERTON, J.

WINDHAM, J.*

---

* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

27